RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0253P (6th Cir.)
File Name: 00a0253p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　*v.*

ROSLYN BUTLER,
　　　　　*Defendant-Appellant.*

No. 99-1149

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 98-90022—George C. Steeh, District Judge.

Argued: May 3, 2000

Decided and Filed: July 28, 2000

Before: MERRITT, JONES, and CLAY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** N.C. Deday LaRene, Bethesda, Maryland, for
Appellant. Jennifer J. Peregord, ASSISTANT UNITED
STATES ATTORNEY, Detroit, Michigan, for Appellee.
**ON BRIEF:** N.C. Deday LaRene, Bethesda, Maryland, for
Appellant. Ronald W. Waterstreet, ASSISTANT UNITED
STATES ATTORNEY, Detroit, Michigan, for Appellee.

1

CLAY, J., delivered the opinion of the court, in which JONES, J., joined.  MERRITT, J. (pp. 16-17), delivered a separate dissenting opinion.

─────────────────

**OPINION**

─────────────────

CLAY, Circuit Judge.  Defendant, Roslyn Butler, appeals from the judgment of conviction and sentence entered by the district court on January 21, 1999, for one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, as well as one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), following a jury trial.  Specifically, Defendant challenges on appeal the district court's order denying her motion to suppress the evidence entered on July 7, 1998, as well as the amended order entered on July 21, 1998.  For the reasons set forth below, we **REVERSE** the district court's order denying Defendant's motion to suppress the evidence, and **VACATE** Defendant's judgment of conviction and sentence.

**BACKGROUND**

*Procedural History*

Defendant and her three co-defendants, Clemant Ezekwemba, Amobi Obioha, and Oge Ukoha, were indicted for conspiracy to distribute cocaine, 21 U.S.C. § 846, and possession with the intent to distribute cocaine, 21 U.S.C. § 841(a)(1), on January 27, 1998.  The indictments arose out of warrantless searches and seizures by the police after the stop of defendants' vehicles in the Detroit metropolitan area on January 10, 1998.

Motions to suppress the fruits of the searches and seizures were filed by all defendants, and an evidentiary hearing was held before United States District Judge John Feikens on April 27 and April 28, 1998.  At the conclusion of the hearing, the court encouraged the parties to file additional

memoranda that they believed to be pertinent to the resolution of the motions and both parties thereafter filed supplemental memoranda. On July 7, 1998, Judge Feikens issued an opinion and order denying defendants' motions to suppress -- including the motion brought by Defendant which is the subject of this appeal. The parties sought reconsideration of the opinion and order, and the district court thereafter issued an amended opinion on July 21, 1998.

On October 1,1998, Defendant was convicted by a jury before United States District Judge George Steeh, to whom her case had been reassigned. Defendant then filed this timely appeal.

### Facts

On January 9, 1998, Mario Burns, a Michigan State Police officer assigned to a Federal Bureau of Investigation sponsored drug interdiction task force, was on duty monitoring a bus station in Detroit in an attempt to interdict the flow of narcotics coming into or leaving the state. At approximately 8:45 p.m., an inbound bus from Chicago arrived and a man carrying a blue duffle bag which appeared to be lightly packed disembarked from the bus. Officer Burns along with a fellow officer approached the man, and identified themselves as police officers who routinely patrol the bus station to investigate the transportation of drugs and drug money. At the officer's request, the man produced a ticket which indicated that he had traveled from Houston, Texas to Chicago, Illinois -- a journey of about twenty-five to thirty hours. Despite the length of the journey, the man told the officers that he would be staying in Detroit for only about a day because he had to return to school. When asked his purpose for visiting Detroit, the man replied that he was here to visit a friend, whom he hesitatingly named only as "Sam." The man also presented a Texas identification card identifying himself as Oge Ukoha. Ukoha consented to a search of the duffel bag that he was carrying. The search revealed only toiletries, two accounting books, and a leather jacket. A Law Enforcement Information Network (LEIN) check was done on

Ukoha, which revealed that he had been arrested in Houston the prior year for marijuana possession. *Id.* at 169.

Ukoha was permitted to leave the bus station by cab at approximately 9:00 p.m., but was followed by the task force officers to a hotel, "Marvin's Gardens Inn" ("the Inn"), where he checked-in and went to his room. The Inn is located on Northwestern Highway in Southfield, Michigan. Officer Burns checked with the desk clerk at the hotel, and learned that Ukoha had paid for one night, double occupancy, and had given an address different from that which he had given when questioned at the bus station. The officers found it suspicious that Ukoha had traveled for twenty-nine hours on a bus from Texas to visit a friend for only one day before returning to Texas; that Ukoha had given the desk clerk a different last name; and that he had paid for the room in cash. As such, at approximately 9:30 p.m., the officers established surveillance on Ukoha's hotel room.

At approximately 3:30 a.m. on January 10, 1998, after having observed no activity from Ukoha's room, the officers temporarily suspended their surveillance until about 7:30 a.m. when the surveillance was reestablished. Nothing remarkable occurred until about 11:41 a.m., when a green Checker Cab arrived at the hotel, driven by a man later identified as Clement Ezekwemba with Defendant Roslyn Butler seated in the backseat. Both Ezekwemba and Defendant got out of the cab and went to a side door of the Inn where they were met by Ukoha. When they entered the Inn, Defendant was carrying a black leather purse, but when Ezekwemba and Defendant left the hotel about twenty-five minutes later, Defendant was carrying a black leather purse along with a white plastic bag. Ezekwemba got into the driver's seat of the cab, while Defendant got into the back seat of the cab, and the two departed.

Shortly thereafter, at approximately 12:30 p.m., Ukoha left the Inn and was carrying a black garment bag in addition to the blue duffel bag that he was carrying at the airport. A person who was later identified as Amobi Obioha drove up in

Thus, there was consent, as found by the District Court, for the delay in allowing the defendant to leave and there was probable cause for the search of the Jeep Cherokee. Accordingly, I would affirm the judgment of the District Court.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting. I disagree with the Court's opinion in two respects. First, I certainly do not find clearly erroneous the District Court's finding that the defendant consented to accompany the police officers to the police station. It seems to me that the District Court was correct in concluding that the defendant tried to allay suspicion by being cooperative with the police. Obviously, she knew she was guilty of smuggling cocaine and had it hidden in the game package in her possession, but she thought that she could deceive the officers if she appeared to cooperate in all respects, including consenting to accompany the officers to the police station and answering their questions. In fact, her strategy almost worked. It would have worked if the police had not found cocaine wrapped in a similar game box in the possession of her confederate as she was just about to leave. Accordingly, I would affirm the District Court's finding of fact that the defendant consented to the ride to the police station and to the interrogation at the police station.

Second, the officers had probable cause to search the defendant's Jeep Cherokee after they learned that the defendant's confederate had a game package similar to the one defendant had and that inside that game package was found two and one-half kilograms of cocaine. Once they knew that the two people, defendant and defendant's confederate, were carrying games of a similar type and that the confederate had cocaine in his game package, the police then had probable cause to believe that defendant's game also probably contained cocaine. They had probable cause to believe that the two were engaged in a similar type of ruse. The automobile exception to the warrant requirement clearly applies here. The court is way off base on this issue. The police were entitled to search the Jeep Cherokee before allowing the defendant and Butler to leave in it.

a green Ford Escort, and Ukoha got into the passenger seat of the car and the two men departed.

In the meantime, Michigan State Police Detective Lieutenant Lawrence Heins, also a part of the task force, and force agent Donald Farago, followed the Checker Cab in which Ezekwemba and Defendant had departed. Lieutenant Heins contacted the dispatch officer of the local police department, Redford Township, to effect a stop of the cab because "there was a drug investigation going on and [he] wanted that vehicle stopped." Lieutenant Heins testified that he observed the cab move from one lane to another without signaling; however, this alleged traffic infraction was not the reason that Lieutenant Heins contacted the Redford Township police.

At approximately 12:25 p.m., Redford Township Police Officers Eric Gillman and Edward Hanish stopped the cab. Both officers testified that the only information they received was that the federal task force wanted a vehicle stopped because it was believed to be "involved in narcotic trafficking," or "narcotics activities." Neither officer was asked to look out for or observed any traffic violations by the cab. Officer Gillman dealt principally with the driver, Ezekwemba, and Officer Hanish dealt with Defendant.

Officer Hanish testified that he approached Defendant, told her that the officers had been instructed to stop the vehicle because it was suspected as being involved in "narcotics activities," and asked Defendant to step out of the cab. Defendant told Officer Hanish that the cab had picked her up at Telegraph and Twelve Mile Roads and that she had just bought a game at the "Toys-R-Us" store. Officer Hanish observed that Defendant had a purse and a white plastic shopping bag next to her in the cab. Officer Hanish stated that Defendant consented to a search of her purse and her bag. Although he found a shrink-wrapped Yahtzee board game inside the white bag, Officer Hanish stated that he did not find anything out of the ordinary or anything that would cause him to believe that Defendant was involved in drug activity.

Officer Hanish then placed Defendant's purse and the bag containing the Yahtzee game on the hood of his patrol car, and asked Defendant if he could "pat her down for weapons" because he was going to have Defendant sit in his patrol car. Defendant was "patted down" and placed in the back seat of the patrol car from which she could not let herself out because the doors do not open from the inside. Once Defendant was seated in the back of the patrol car, Officer Hanish went to assist Officer Gillman with Ezekwemba back at the cab.

Officer Gillman had approached Ezekwemba and asked for identification, which Ezekwemba provided. Officer Gillman then asked Ezekwemba to step outside of the vehicle because Officer Gillman wanted to "speak with him back towards my patrol car." Ezekwemba exited the vehicle and walked back toward the patrol car; however, he refused to be seated in Officer Gillman's patrol car. Officer Gillman testified that he explained to Ezekwemba that it was necessary for him to be seated in the patrol car because "he was going to be detained and we were going to talk with him." Officer Gillman went on to testify that he then "placed [his] hands on [Ezekwemba] to have him have a seat in the back of the car, at which point [Ezekwemba] used an amount of force to push [Officer Gillman] away and did not want to get in the back of the car." A struggle then ensued in an attempt to get Ezekwemba in the back of the patrol car, which Officer Gillman described as follows:

> There was no force against me at that point, other than him using what I would call defensive force. He just didn't want to do what I wanted him to do at that time. He was not being violent toward me. I was trying to secure him and at that point arrest him for interfering.

Officer Hanish assisted Officer Gillman in the ensuing struggle, and at one point Ezekwemba pushed Officer Hanish into traffic along Telegraph Road. According to Officer Gillman, Agent Farago arrived on the scene at about that time, and the three officers were able to subdue Ezekwemba and place him in the patrol car. Ezekwemba was charged with

have obtained a search warrant to search Defendant's Jeep Cherokee.

## CONCLUSION

In summary, we hold that the district court erred in denying Defendant's motion to suppress the evidence where Officer Hanish admitted that nothing in Defendant's answers or in the limited search led Officer Hanish to believe that Defendant was involved in narcotics activities, and her continued detention was therefore unlawful. *See Berkemer,* 468 U.S. at 439-40 (finding that "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released"). We therefore **REVERSE** the district court's order denying Defendant's motion to suppress the evidence, and **VACATE** her judgment of conviction and sentence.

Defendant and seized the white bag from her Jeep Cherokee, they properly acted on reasonable suspicion. Although it is true that the officers conducting the stop had reasonable suspicion to stop the vehicles based upon the information from the officers conducting surveillance, *see Hensley,* 469 U.S. at 232, it is equally as true that the detention of the persons stopped could not extend past "checking out the suspicious circumstances that led to the original stop. . . ." *See Obasa*, 15 F.3d at 607; *see also Hayes,* 470 U.S. at 815-16; *Berkemer,* 468 U.S. at 439-40. Here, Officer Hanish admitted that after he questioned Defendant, searched her purse and bag, and patted her down, nothing led him to believe that Defendant was involved in drug activity. Therefore, any further detention of Defendant beyond this point was in violation of the Fourth Amendment, and the district court erroneously concluded that the officers were legally allowed to arrest Defendant and seize her bag based upon reasonable suspicion. Again, it is well-established that "[w]hen a detention rises to the level of a full-fledged arrest, . . . the Fourth Amendment demands that the seizure be supported by probable cause." *See Gardenshire,* 205 F.3d at 303.

Furthermore, in its amended opinion, the district court erroneously found that the police officers had probable cause as well as Defendant's consent to search Defendant's Jeep Cherokee. Our analysis need not reach this point inasmuch as the continued detention of Defendant past the purpose of the initial stop was illegal. In any event, the record is not clear that consent was given to search Defendant's vehicle, where Defendant's niece testified that the officers "demanded" that she unlock the Jeep after the officers unsuccessfully tried to open the vehicle themselves, and there is nothing to indicate that consent was nonetheless voluntarily given by Defendant or her niece. *See Williams,* 754 F.2d at 674-75. In addition, once the officers learned that the Balderdash game found in Ukoha's possession had cocaine concealed inside, thereby arguably providing probable cause to believe that the Yahtzee game might also contain illegal drugs, the officers should

---

resisting, and assault and battery on an officer, and placed under arrest.[1] Ezekwemba was bleeding from his lip or forehead from injuries he may have sustained when his face struck the ground during the struggle with the officers.

Officer Gillman and Officer Hanish then searched the cab, believing that they were looking for narcotics, specifically "crack cocaine," but found nothing. Officer Gillman took Ezekwemba to the Redford Police Station. Officer Hanish testified that Defendant agreed to accompany him to the police station to answer some questions; however, he acknowledged that at no time before entering the police station did he inform Defendant that she was free to leave. While at the station, Officer Hanish returned Defendant's purse and white plastic bag containing the board game, and had Defendant sit in the lobby until the agents came to talk to her. Defendant asked to make a telephone call, and Officer Hanish allowed Defendant to do so.

About five minutes later, Lieutenant Heins arrived at the station and took Defendant into a private room off of the lobby, which Officer Hanish described as "an interview room" containing a table and a couple of chairs. Lieutenant Heins and Defendant had about a fifteen to twenty minute conversation in which Lieutenant Heins identified himself, explained "what was going on," and asked Defendant for her cooperation in the investigation. As Lieutenant Heins and Defendant were exiting the interview room, Defendant's niece, Carol Butler, was entering the police station. Lieutenant Heins stated that at this point, it had been about one-half hour since Defendant had been brought into the police station.

Butler testified for Defendant at trial, and stated that she had received a call from Defendant asking Butler to pick her

---

[1]This testimony from Officer Gillman was contradicted by Agent Farago who stated that although he observed the stop of the cab, he then went to participate in the surveillance of the green Escort, and had no contact with either of the occupants in the cab after it was stopped.

up from the police station. Butler testified that when she saw Defendant at the station, Defendant was crying and upset; that Defendant gave Butler the white bag; and that one of the officers informed Butler that Defendant could not leave for about fifteen minutes. Butler left at that point with the bag, apparently to get a beverage.

In the meantime, Southfield Police officers had been requested to stop the green Escort in which Ukoha had left the Inn. The vehicle was searched, and two and one-half kilogram blocks of cocaine were recovered from a "Balderdash" game found in a piece of luggage in the car. Back at the Redford Police station, Lieutenant Heins learned about the cocaine recovered from the Balderdash game, and recalled the Yahtzee game that Defendant had when they stopped the vehicle. At that point, Defendant was arrested, searched, and placed in a holding cell. Butler then returned to the police station,[2] and was asked by Lieutenant Heins and Officer Hanish as to the whereabouts of the Yahtzee game. Butler replied that it was in Defendant's Jeep Cherokee that Butler had been driving. According to Lieutenant Heins, Officer Hanish and Butler accompanied him outside to the vehicle; he observed the box through the window, and asked Butler's permission to look into the Yahtzee box, to which she replied in the affirmative.

However, Butler testified that she told the officers that she had taken the bag home, to which the officers replied that they wanted to check her vehicle. Butler further testified that upon reaching the vehicle, the officers tried unsuccessfully to open the door, so they demanded that she unlock the vehicle, which she did. Butler stated that she did not consent to the entry or search of the vehicle; she only complied with the order. The Yahtzee box was removed from the vehicle, slit open, and searched. Three and one-half kilogram blocks of cocaine were recovered from the box.

---

[2] According to Lieutenant Heins, Butler returned about an hour later; but according to Officer Hanish, Butler returned about ten to fifteen minutes after she had been there the first time.

comply with the officer's further requests, even if she did in fact agree to his requests. *See United States v. Walker,* 933 F.2d 812 (10th Cir. 1991) (holding that "[i]f the consent is not sufficiently an act of free will to purge the primary taint of the illegal detention, [the evidence] must be suppressed as 'fruit of the poisonous tree'"). Moreover, once positioned in the back of the patrol car, Defendant was unable to voluntarily leave, even if inclined to do so. *See Richardson,* 949 F.2d at 857.

Although we base our holding on the premise that the stop became illegal once Defendant was placed into the back of the patrol car, we note that the officers' actions of transporting Defendant to the police station for the purpose of detaining and questioning her further, clearly violated Defendant's Fourth Amendment rights as well. *See Hayes,* 470 U.S. at 815-16. Indeed, after Defendant had been detained and questioned at the police station, she was informed by the officers that she could not leave for about fifteen more minutes even after Defendant's niece arrived to pick her up. The police officers' continued detention of Defendant was well beyond the scope and duration necessary to check out the suspicious circumstances that led to the original stop, and therefore violated Defendant's Fourth Amendment rights, even if she had voluntarily traveled to the police station with the officers. *See Obasa,* 15 F.3d at 607. "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry,* 392 U.S. at 18. That is exactly what happened in the case at hand, and the district court erred in concluding otherwise.

The district court found that because the officers who originally conducted the surveillance of Defendant and Ukoha had a reasonable suspicion to stop the respective vehicles, the officers from the Redford police department and the Southfield police officers properly relied upon that information in conducting the actual stops. The court also found that when the officers 1) stopped the cab, patted Defendant down, and questioned her, and 2) arrested

under the Fourth Amendment to allow Defendant to go free. *See Hayes,* 470 U.S. at 815-16; *Berkemer,* 468 U.S. at 439-40. In fact, Officer Hanish testified that at the time he placed Defendant in the back of the patrol car, he had found nothing about the stop that led him to believe that Defendant was involved in drug activity. The officer's continued detention of Defendant in the back of the locked patrol car ripened the investigatory stop into an arrest; and because the officers did not have probable cause to arrest Defendant at that time, the seizure was illegal. *See Hayes,* 470 U.S. at 815-16. We have long recognized that officers cross the line from an investigatory stop into an arrest when they place a suspect in a police vehicle for questioning:

> When the agents placed [the defendant] in the back of the police car, they went beyond the bounds of *Terry*. Placing [the defendant] in the police cruiser not only constituted a seizure, as mentioned earlier, but also crossed the line into an arrest. [The defendant] was moved from his car to another location, and his freedom of movement was severely restricted.

*See United States v. Richardson,* 949 F.2d 851, 857 (6th Cir. 1991).

The district court's holding that Defendant consented to sit in the patrol car and to be transported to the police station is not supported by the facts. Consent is judged under the totality of the circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "Consent must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." *United States v. Williams,* 754 F.2d 672, 674-75 (6th Cir. 1985). In this case, the government failed to meet this burden in claiming that Defendant consented to sitting in the police car, traveling to the police station, remaining at the station, and answering questions. Clearly, upon seeing Ezekwemba being physically forced into the police car by the officers, it is hard to imagine that Defendant would not have felt coerced to remain in Officer Hanish's patrol car and

The next day, January 11, 1998, prior to beginning his shift, Officer Hanish discovered a cloth bag under the passenger seat side of the police car which he had used to transport Defendant to the police station the previous day. Officer Hanish stated that the cloth bag was found where Defendant's feet would have been while she was seated in the car, and contained what appeared to be another block of cocaine packaged exactly as the cocaine recovered from Yahtzee game.

## DISCUSSION

Defendant argues that the district court erred in denying her motion to suppress the evidence where the scope and length of the stop exceeded the bounds permitted under *Terry v. Ohio*, 392 U.S. 1 (1968). We agree.

We review a district court's factual findings on a motion to suppress for clear error; however, a district court's application of the law to the facts is reviewed *de novo*. *See United States v. Thomas,* 11 F.3d 620, 627 (6th Cir. 1993).

"Stop and frisk" cases are ultimately governed by the Supreme Court's decision in *Terry*, where the Court held as follows:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. at 30. In other words, under *Terry*, when a police officer reasonably concludes that criminal activity may be afoot, the officer may briefly stop the suspicious person and make "reasonable inquiries" aimed at confirming or dispelling his suspicions, and may conduct a patdown for weapons. *Id.* In *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993), the Supreme Court further held that "police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry*[,] . . . so long as the officers' search stays within the bounds marked by *Terry*[,]" thereby establishing the so-called "plain-feel" exception to a warrant.

The brevity and limited nature of *Terry*-type stops have been repeatedly affirmed. *See United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994). That is to say, "[w]hen police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause." *Id.* In short, upon making the stop,

> the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obligated to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.

*Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984) (footnotes omitted). "When a detention rises to the level of a full-fledged arrest, . . . the Fourth Amendment demands that the seizure be supported by probable cause." *See Gardenshire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000). A "seizure" occurs for purposes of the Fourth Amendment when the police detain an individual under circumstances where a reasonable person would feel that he or she is not at liberty to leave. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

The Supreme Court explained the point at which an investigative detention triggers the full protection of the Fourth Amendment as follows:

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. *And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.* We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 815-16 (1985) (citations omitted; emphasis added).

Applying these Fourth Amendment jurisprudential principles to the case at hand, we hold that  the district court erred in denying Defendant's motion to suppress the evidence where upon learning Defendant's identity and that she was not armed or carrying contraband (as determined by the patdown search), the Redford Police officers unreasonably seized Defendant by placing her in the police car and questioning her further; transporting her to the police station; detaining Defendant while at the police station; and questioning her further once there. Although the officers properly relied upon the bulletin from Lieutenant Heins which indicated that Ezekwemba and Defendant were suspected as being involved in drug trafficking so as to justify the initial stop of the cab, *see United States v. Hensley*, 469 U.S. 221, 232-33 (1985), once Defendant identified herself, answered the officer's questions, and consented to the patdown which did not reveal anything suspicious, the officers were required