**Michael COBB, Plaintiff,**

v.

**CITY OF COLUMBUS,
et al., Defendants.**

**No. 2:99–CV–579.**

United States District Court,
S.D. Ohio,
Western Division.

April 20, 2001.

828

James Donald McNamara, Columbus, OH, for plaintiff.

Patricia A. Delaney, Columbus City Attorney's Office, Columbus, OH, for defendant.

## *OPINION AND ORDER*

KING, United States Magistrate Judge.

Plaintiff Michael Cobb brings this action under 42 U.S.C. § 1983, seeking monetary damages from defendant Donovan Kane, an officer of the Columbus Police Department ["CPD"].[1] Plaintiff alleges that defendant Kane stopped plaintiff without le-

gal justification and conducted an illegal pat-down search of him in violation of his rights under the Fourth Amendment. Defendant Kane contends that he had reasonable suspicion to stop the vehicle in which plaintiff was a passenger and to perform a brief pat-down of plaintiff.[2] The parties have consented to disposition by the undersigned. 28 U.S.C. § 636(c). Trial to the Court was held on February 22, 2001. Pursuant to the provisions of Fed.R.Civ.P. 52(a), the Court now makes the following findings of fact and conclusions of law.

## I. The Evidence

Both plaintiff Michael Cobb and Bobby Haddix testified that on the evening of June 10, 1998, Cobb met Haddix at the latter's residence.[3] The two left for the area around the Ohio State University in Columbus, Ohio, in Haddix's red Z–28 Camaro. They first went to Scully's, where they played pool and watched television. Later in the evening, the two walked to Panini's, a restaurant and bar, where they remained until about 2:30 a.m. They then walked back to Haddix's vehicle. Haddix was driving south on High Street when the men passed a Taco Bell restaurant, decided to eat, and circled the block. Haddix turned north from Eighth Avenue onto High Street. As they waited in the left turn lane to enter the Taco Bell premises, plaintiff noticed that a police cruiser was behind them.

Defendant Kane testified that both he and Officer Frank Nichols[4] were on routine motor patrol in a marked police cruis-

---

1. Plaintiff originally also named the City of Columbus as a defendant in this case. However, on June 6, 2000, the parties filed a stipulation of dismissal with prejudice with respect to the city. Accordingly, the City of Columbus is no longer a party to this lawsuit.

2. Other claims presented in the complaint were resolved adversely to plaintiff by earlier

order of the Court. *Opinion and Order* (October 20, 2000).

3. A partial transcript consisting of defendant Kane's testimony will be cited throughout the opinion; however, the testimony of other witnesses has not been transcribed.

4. Nichols testified by deposition.

er at approximately 2:45 a.m. on the morning of June 11, 1998. *Transcript*, at 8, 12. The officers were driving north on High Street, between Eighth and Euclid Avenues, when a group of five or six young men flagged them down. *Tr.*, at 14, 80; *Deposition of Frank Nichols*, at 14, 15. These young men, who were upset and very excited, informed the officers that a vehicle, possibly a Trans–Am, Camaro, or Thunderbird, had been following them and that the occupants of the vehicle had been threatening to "kick their ass." *Tr.*, at 14–17; *Nichols Depo.*, at 14, 15. Although defendant initially testified on deposition that these men informed the officers that the vehicle following them was black, *Deposition of Donovan Kane*, at 14, he testified at trial that the men did not indicate the color of the vehicle. *Tr.*, at 17.[5] The young men did not indicate that the occupants of the vehicle had weapons. *Tr.*, at 25–26; *Nichols Depo.*, at 45. One of the young men pointed a vehicle out as the one that had been following the group. *Tr.*, at 28; *Nichols Depo.*, at 15. Defendant testified that the vehicle, which was parked in a lot just south of the officers, and on the west side of High Street, sat in the lot for approximately 10 to 15 seconds before pulling north onto High Street. *Tr.*, at 28–29. Officer Nichols first observed the vehicle after it had pulled back onto High Street, apparently from either a side street or a parking lot. *Nichols Depo.*, at 20–21. When the vehicle passed the cruiser, the officers pulled onto High Street. *Id.* Although plaintiff disputes the incident with the group of young men, the Court finds that defendant's evidence concerning this group, *i.e.*, the testimony of both defendant Kane and Officer Nichols, is credible and that the group of young men did, in fact, approach the officers.

Although plaintiff testified that there was other traffic on High Street, defendant testified that no other vehicles were between the Haddix vehicle and the police cruiser. *Id.*, at 35–36. According to defendant, the cruiser caught up to the Haddix vehicle when it slowed down to turn into Taco Bell. *Id.*, at 36. Plaintiff and Haddix testified, and defendant does not dispute, *Id.*, at 45; *Nichols Depo.*, at 26, that the Haddix vehicle, followed by the police cruiser, pulled into the drive-through line at Taco Bell. At the officers' directive, Haddix left the drive-through line and pulled into a parking space facing the neighboring 7–Eleven convenience store. *Tr.*, at 45. The parking lot was well lit. *Id.*, at 47. Officer Nichols approached the driver's side of the vehicle and defendant approached plaintiff on the passenger side. *Id.*, at 48; *Nichols Depo.*, at 26. Defendant did not specifically recall whether either of the occupants asking why they had been stopped. *Tr.*, at 49. However, defendant testified that he and Nichols informed the occupants of the vehicle why they had been stopped. *Id.* According to defendant, plaintiff objected that he and Haddix had done nothing wrong. *Id.*, at 52. Defendant asked plaintiff for identification more than once and plaintiff refused each request. *Id.*, at 52–53; *Nichols Depo.*, at 28. Defendant also testified that plaintiff refused to even verbally provide his name and date of birth. *Tr.*, at 53. At that point, defendant ordered plaintiff out of the vehicle because "[h]e was going in the back of the cruiser ...." *Tr.*, at 63. *See also Id.*, at 57.

Plaintiff and Haddix testified that the officers did not inform them of the reason for the stop of the vehicle. In fact, both men testified that, when plaintiff asked the

---

**5.** Even on deposition, defendant later distanced himself from his earlier testimony about the color of the car. *Kane Depo.*, at 29.

officers why he and Haddix had been stopped, the officers did not immediately answer. According to plaintiff, Officer Nichols eventually responded, "For harassing those people over there." Plaintiff then asked, "What people?" It was at this point that, according to plaintiff, defendant asked him if he "wanted to show him his i.d.?" Plaintiff responded in the negative. He again asked, "What people?" Defendant then asked him to step out of the vehicle. Plaintiff and Haddix both testified that, up to this point, neither officer questioned them about the alleged incident with the group of young men on High Street.

The Court finds that plaintiff was an extremely credible witness. His demeanor was forthcoming and his testimony was without evasiveness; he resisted exaggeration, even when testifying about his subjective response to the events of that night. The Court therefore accepts plaintiff's version of the events and his testimony that defendant requested identification only once before ordering plaintiff out of the vehicle.

The parties agree that plaintiff obeyed defendant's order to step out of the vehicle. *Id.*, at 56. As plaintiff exited the vehicle, he made no furtive movements or threatening comments. Defendant saw no sign of weapons. *Id.*, at 60–62. Once plaintiff exited the Haddix vehicle, defendant directed him to the back of the vehicle. *Id.*, at 56. Defendant had plaintiff interlace his fingers behind his head, *Id.*, and informed plaintiff that he would be patted down. *Id.*, at 57. Defendant placed one hand on top of plaintiff's interlaced fingers and lightly patted down Cobb's outer clothing. *Id.*, at 63.

Defendant testified that, prior to patting plaintiff down, he asked plaintiff "if there was anything that [defendant] should know about." *Id.*, at 88. ·Although plaintiff responded in the negative, defendant felt a "hard ... rectangular-shaped box," *Id.*, at 89, in plaintiff's front left pocket. Defendant asked plaintiff what the object was, and plaintiff responded that defendant didn't "need to know what it is." *Id.*, at 90.[6]

The parties agree that other police officers were in the Taco Bell parking lot during some or all of these events. Plaintiff and Haddix testified that they did not observe either Officer Nichols or defendant speak with the other officers; defendant testified that, within minutes after stopping the Haddix vehicle, he and Officer Nichols sent another officer, whom defendant could neither identify nor describe at trial, *Id.*, at 59–60, down the street to locate the victims. *Id.*, at 40, 59. *See also Nichols Depo.*, at 36. The men were never located. *Id.*, at 60; *Nichols Depo.*, at 37.

As noted *supra*, Officer Nichols approached Haddix, who was driving his car that night. Nichols asked Haddix for identification, *Nichols Depo.*, at 26, which Haddix provided. *Id.*, at 46. Haddix was never directed to leave the car, nor was he patted down, searched, arrested or charged with any offense. Officer Nichols testified on deposition that he heard defendant ask plaintiff for identification and then direct plaintiff to get out of the vehicle. *Id.*, at 28. Nichols "guess[ed]" that the order was issued because plaintiff did not provide identification. *Id.*, at 29. At that point, Nichols moved to the other side of the car to assist his partner if necessary. *Id.*, at 30. He focused his attention

---

**6.** The object was apparently drug paraphernalia. Defendant detained plaintiff and issued him a misdemeanor summons for drug abuse and possession of drug paraphernalia. As noted *supra*, plaintiff's claim arising out of his arrest was previously resolved adversely to plaintiff. *Opinion and Order* (October 20, 2000).

on plaintiff. *Id.* Nichols did not observe plaintiff do anything threatening toward either police officer. *Id.* Importantly, Officer Nichols did not fear for his personal safety. *Id.*, at 31. Afterwards, defendant told Nichols that plaintiff "was being uncooperative, he wouldn't give him his ID and since we were investigating this, we had to get him out." *Id.*, at 32. Defendant testified at trial that he had determined to place plaintiff in the cruiser in order to continue his investigation: "And he, being the passenger, was being uncooperative and we thought maybe he would be more cooperative if he didn't have his friend next to him." *Tr.*, at 86.

Plaintiff testified that the pat-down was light and was completed within 15 to 30 seconds. The parties agree that there were other people in the Taco Bell parking lot at the time of the pat-down. Plaintiff experienced "a little" embarrassment due to being searched in front of these people.[7]

## II. Discussion

### A. The Standard

The Fourth Amendment, which applies to the states by incorporation through the Fourteenth Amendment, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects citizens from unreasonable searches and seizures by providing that no arrest or search warrant "shall issue, but upon probable cause." *Id.* There are, however, certain "narrowly drawn exception[s] to the probable cause requirement of the Fourth Amendment." *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir.1991) (citations omitted). In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court recognized that a police officer may con-

duct a limited stop for the purpose of "investigating possible criminal behavior even though there is no probable cause to make an arrest," as long as the officer can "point to specific and articulable facts" arousing reasonable suspicion of criminal activity. *Id.*, at 21–22, 88 S.Ct. 1868. In considering *Terry's* concept of reasonable suspicion, the United States Court of Appeals for the Sixth Circuit has noted:

> Even if each specific fact relied upon by the authorities to make a *Terry* stop would not be a basis for suspicion when considered in isolation, the reasonable suspicion necessary to support an investigatory stop can still be found when it is "based upon an assessment of all circumstances surrounding the actions of a suspected wrongdoer," including those facts that would arouse suspicion only in someone experienced in law enforcement matters.

*United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir.1993) (citation omitted).

■■■ During a *Terry* stop, furthermore, a police officer may conduct a limited search for weapons if the officer believes that a suspect may be armed and dangerous. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *United States v. Walker*, 181 F.3d 774, 778 (6th Cir.1999). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. In this regard, the officer may not rely merely on a "hunch," but must be able to point to "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.*

The purpose of this limited search "is not to discover evidence of crime, but to

---

7. Plaintiff acknowledged that this was not his first arrest—or even pat-down.

832

allow the officer to pursue his investigation without fear of violence." *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Accordingly, a *Terry* pat-down "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer." *Walker,* 181 F.3d at 778.

**B. Application**

■ Plaintiff alleges, first, that defendant subjected him to a *Terry* stop without legal justification in violation of the Fourth Amendment. Defendant contends that he had reasonable suspicion to stop the vehicle in which Cobb was riding based on the allegations of the young men and their identification of the Haddix vehicle. The Court credits defendant's testimony in this regard and concludes that defendant's initial stop of plaintiff did not violate plaintiff's Fourth Amendment rights. *See Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

Next, plaintiff alleges that defendant conducted an illegal pat-down of him in violation of the Fourth Amendment. Defendant responds that the pat-down was justified and complied with the *Terry* standard. The fact that the Court has found in favor of the defendant on the issue of the initial stop is not necessarily determinative of the legality of the pat-down:

Case law teaches that any search of the detainees must be limited to a protective frisk for weapons, and before such a pat down search can be conducted the police officer must have reason to believe that the suspect may be armed and dangerous.

*United States v. Oates,* 560 F.2d 45, 61 (2d Cir.1977) [citations omitted].

■ The Court notes, first, that defendant's placement of plaintiff in the rear of his police cruiser constituted an arrest, for which probable cause was a necessary justification. The United States Court of Appeals for the Sixth Circuit has "long recognized that officers cross the line from an investigatory stop into an arrest when they place a suspect in a police vehicle for questioning." *See United States v. Butler,* 223 F.3d 368, 375 (6th Cir.2000). *See also United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

When the agents placed [the defendant] in the back of the police car, they went beyond the bounds of *Terry.* Placing [the defendant] in the police cruiser not only constituted a seizure, as mentioned earlier, but also crossed the line into an arrest. [The defendant] was moved from his car to another location, and his freedom of movement was severely restricted.

*United States v. Richardson,* 949 F.2d at 857.

■ "Searches incident to a lawful arrest are justified without any level of suspicion." *United States v. Wall,* 807 F.Supp. 1271, 1275 (E.D.Mich.1992). *See also Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). "However, a warrantless search that provides probable cause to make a subsequent arrest may not be justified as a search incident to that arrest." *Wall,* 807 F.Supp. at 1275. *See also Smith v. Ohio,* 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990). Although defendant had no probable cause to arrest plaintiff at the point that he first decided to place plaintiff in the cruiser, defendant's subsequent discovery of drug paraphernalia on plaintiff's person provided the probable cause sufficient to justify plaintiff's actual arrest. *Opinion and Order,* at 13 (October 20, 2000). However, the issue remains whether the pat-down that lead to the discovery of the paraphernalia was justified under *Terry.*

Defendant argues that he had a reasonable articulable suspicion that plaintiff was

armed and dangerous based on the totality of the circumstances: the victims' identification of the Haddix vehicle, *Tr.*, at 81, 97, the nature of the crime being investigated, *i.e.*, misdemeanor menacing, the fact that only two individuals allegedly threatened a group of five or six, *Id.*, at 62, 85, 87, 97, and plaintiff's refusal to cooperate with defendant's investigation and request for identification. *Id.*, at 58, 97. Defendant's testimony emphasized that it "crossed [his] mind" that weapons were involved in the alleged incident because the officer could not "think of any good reason why two people would threaten five people." *Id.*, at 85. Defendant continued, "[I]f this was, indeed, the vehicle that was [threatening the group of young men] and there is [sic] two people making the threats, there was a possibility that there was a weapon. And that's what we believed." *Id.*, at 88. However, defendant also repeatedly testified that he ordered plaintiff out of the Haddix vehicle with the intention of placing plaintiff in the cruiser to continue his investigation, *Id.*, at 57, 63, 86, and that he patted plaintiff down incident to that intention. *Id.*, at 63. This, of course, is insufficient to meet the standard of *Terry*.

In determining the actual motivation for the pat-down of plaintiff, it is instructive to compare plaintiff's treatment on the night in question with that of Haddix. Defendant does not contend that plaintiff made any furtive or unusual movements to indicate that he was retrieving or hiding an object and he concedes that plaintiff cooperated with defendant's orders to exit the vehicle and place his hands behind his head. The only fact that distinguishes plaintiff from Haddix was plaintiff's refusal to identify himself to defendant. The Court finds that it was this refusal that actually motivated defendant's pat-down of plaintiff. The Court must therefore determine whether a refusal to provide identification when asked during a *Terry* stop justifies a pat-down of the person.

■ The Supreme Court has stated that, upon making a *Terry* stop,

> the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obligated to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.[8]

*Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). *See also Butler*, 223 F.3d at 374. Just as the refusal to cooperate in a *Terry* stop cannot justify an arrest, this Court concludes that the mere refusal to identify oneself during the course of a *Terry* stop does not justify a pat-down for weapons.

■ Moreover, the Court concludes that even the totality of the circumstances in the case at bar were insufficient to create

---

**8.** In his concurrence in *Terry*, Justice White stated:

> There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way. However, given the proper circumstances, such as those in this case, it seems to me the person may be briefly detained against his will while pertinent questions are directed to him. Of course, the person stopped is

not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation.

*Terry*, 392 U.S. at 34, 88 S.Ct. 1868 (White, J., concurring). "Although Justice White's concurrence was not part of the holding in *Terry*, it has been frequently cited or mentioned by the Court in subsequent opinions." *Risbridger v. Connelly*, 122 F.Supp.2d 857, 864 (W.D.Mich.2000).

a reasonable suspicion in defendant's mind that plaintiff was armed and dangerous. First, the Court notes that the alleged victims made no mention of weapons when informing the officers that they had been followed and harassed. *Tr.*, at 25–26. Second, defendant's partner, Officer Nichols, testified on deposition that he had no suspicion that plaintiff was armed and dangerous:

Q: Did you see Michael Cobb do anything threatening toward either of you officers before he was searched?

A: No.

 *  *  *  *  *  *

Q: And you did not see Mr. Cobb do anything that made you feel fearful for your personal safety; isn't that true?

A: I did not, no.

 *  *  *  *  *  *

Q: And you never saw Mr. Cobb do anything that would suggest he might become violent ...?

A: Right.

*Nichols Depo.*, at 30–32. Third, defendant testified at trial that he had not observed plaintiff make any threatening or furtive movements. *Tr.*, at 60, 61–62. Fourth, defendant testified in his deposition that he did not see anything about plaintiff's conduct that made him suspect that plaintiff might be armed and dangerous. *Kane Depo.*, at 30. Fifth, although defendant testified at trial that plaintiff's refusal to provide identification created a suspicion in defendant's mind that plaintiff was armed and dangerous, defendant's only articulated basis for that suspicion was that he "saw no reason for [plaintiff] not to cooperate to get [the investigation] over with, so we could figure out what's going on and everybody could go on their own

way." *Tr.*, at 98. While plaintiff's refusal to provide identification convinced defendant that more investigation was warranted, *See Tr.*, at 57, 85, the Court specifically finds that defendant's pat-down of plaintiff was not a consequence of the defendant's fear that plaintiff was armed and dangerous. Under the circumstances, the Court concludes that "a reasonably prudent man in [defendant's] circumstances would [not have been] warranted in the belief that his safety or that of others was in danger." *See Terry*, 392 U.S. at 27, 88 S.Ct. 1868.

### C. Damages

Having found that plaintiff has established a violation of his Fourth Amendment rights, the Court must now consider the relief to which plaintiff is entitled by reason of that violation. " 'The basic purpose' of § 1983 is 'to compensate persons for injuries that are caused by the deprivation of constitutional rights.' " *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (quoting *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). Even in the absence of proof of tangible loss, the victim of a constitutional violation is entitled to compensation for "humiliation, mental suffering and the intangible loss of civil rights ...." *Green v. Francis*, 705 F.2d 846, 850 (6th Cir. 1983).

Plaintiff testified that the unlawful pat-down was light and of short duration; he suffered "a little" embarrassment as a consequence. Under these circumstances, the Court finds that damages in the amount of $500.00 will reasonably compensate plaintiff for the "humiliation, mental suffering and the intangible loss" of his Fourth Amendment rights.[9]

---

**9.** Although the complaint also contains a claim for punitive damages, plaintiff introduced no evidence at trial in support of this claim. The Court therefore assumes that plaintiff has abandoned any claim for punitive damages.

## III. Conclusions of Law

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has personal jurisdiction over the parties.

The Court concludes that plaintiff's rights under the Fourth Amendment were not violated when defendant stopped the car in which plaintiff was a passenger, but that plaintiff's rights under the Fourth Amendment were violated when defendant conducted a pat-down of plaintiff.

The Court awards compensatory damages in favor of plaintiff and against the defendant in the amount of $500.00 (Five Hundred Dollars) in connection with the violation of plaintiff's Fourth Amendment rights.

The Clerk shall enter **FINAL JUDG-MENT** accordingly.