**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Charles Shajuan RANDALL,**
**Defendant–Appellant.**

**No. 01–3855.**

United States Court of Appeals,
Sixth Circuit.

April 22, 2003.

Before CLAY and ROGERS, Circuit Judges; and COFFMAN, District Judge.*

ROGERS, Circuit Judge.

Charles Randall pleaded guilty to one count of possession of cocaine base with the intent to distribute after the district court denied his motion to suppress certain evidence collected during a traffic stop of Randall's car. Randall now appeals the denial of his motion to suppress. We conclude that (1) the initial stop of Randall's vehicle was reasonable, (2) his continued detention and questioning were reasonable, and (3) the district court's finding that Randall's consent to a frisk and his consent to subsequent searches were freely and voluntarily given was not clearly erroneous. Accordingly, we AFFIRM the district court's denial of Randall's motion to suppress.

## FACTS

On March 9, 2000, Ohio State Patrolman John D. Hromiak was patrolling traffic on Interstate 80, near the Ohio–Pennsylvania border. At approximately 6:30 A.M., Hromiak observed a car proceeding westbound in the passing lane, traveling at approxi-

---

* The Honorable Jennifer B. Coffman, United States District Judge for the Eastern and Western Districts of Kentucky, sitting by designation.

mately fifty-five to sixty miles per hour. The car appeared to be riding on the yellow line that separated the lanes of traffic and Hromiak decided to follow the automobile for observation. Hromiak followed the vehicle for approximately two miles and observed the vehicle ride the yellow line three more times during that span.

Believing that he had probable cause to stop the vehicle for a lane violation, Hromiak activated his lights and Randall immediately pulled his vehicle over to the right emergency lane. Due to the sudden appearance of a previously unobserved second passenger, Hromiak then used his loudspeaker to order Randall out of the vehicle, requesting that he bring along his license, registration and proof of insurance. Randall exited the vehicle and provided Hromiak with his license and a rental car agreement.

Hromiak then asked Randall whether he had rented the vehicle, to which Randall explained that a friend had rented the vehicle for him and that Randall had, in turn, rented a vehicle for his friend. Hromiak considered this answer unusual and asked Randall if he would wait in the back of the police cruiser while he checked Randall's license and inspected the rental agreement. Randall agreed to wait in the back of the cruiser.

Prior to placing Randall in the back of the cruiser. Hromiak asked if he could, for his safety, pat Randall down. Randall consented to the frisk. As Hromiak searched Randall, he felt a soft, large bulge in Randall's left jacket pocket. Upon noticing the bulge, Hromiak asked Randall if he would not mind taking the object out of his pocket. Randall complied with the request, handing Hromiak a closed brown paper bag, which he then opened. Hromiak testified, without contradiction, that Randall consented to the removal of the bag from the jacket pocket and the subsequent search.

Upon opening the bag, Hromiak discovered several one inch by one-half inch ziplock baggies. Hromiak, based upon his experience, knew that this type of ziplock baggie is commonly associated with drug trafficking. Hromiak then asked Randall why he had the large number of bags in his pocket, to which Randall nervously responded that he had traveled to Connecticut to purchase diamonds.

Hromiak then placed Randall into the back seat of the police cruiser and continued to question Randall about his trip to Connecticut. Randall first explained that he had stayed in Connecticut for a couple of days, and then said that he had only stayed for one day. Randall also said that he was visiting friends, then he said that he was visiting his sister. Despite claiming to have visited his friends, Randall could not tell Hromiak where his friends lived in Connecticut. During this time, Hromiak noted that Randall continued to appear nervous, avoided eye contact, and shifted uncomfortably in the back seat.

Based upon what Hromiak had learned and observed—Randall's possession of the baggies. Randall's inconsistent story, the unusual rental arrangement, the length of Randall's stay, and his nervousness—Hromiak began to suspect that Randall might be involved in criminal activity. Hromiak then requested that a canine unit be dispatched to the scene to inspect Randall's vehicle.

The canine unit responded quickly, arriving within approximately seven minutes of the initial stop of the vehicle and before Hromiak had finished his record check on Randall. The canine then inspected the vehicle and alerted her handler and Hromiak that drugs were present in the vehicle. The officers then searched the vehicle and discovered two bags filled with marijuana

and approximately fifteen bags of crack cocaine. The officers then arrested Randall and his passenger.

Before his scheduled trial, Randall moved the district court to suppress all evidence discovered during the search and seizure of his person and vehicle, any statement he made to law enforcement, and all evidence obtained through the use of electronic surveillance. The court denied his motion, finding that (1) Hromiak had probable cause to stop Randall's vehicle for his violation of Ohio Revised Code § 4511.33,[1] (2) the initial detention after the stop was permissible to permit Hromiak to establish identity and general facts, (3) Hromiak's uncontradicted testimony established Randall's consent to the frisk and subsequent search, (4) the continued detention and wait for the canine unit was justified by the articulable suspicion of criminal activity that arose from Randall's nervous demeanor, his evasive and suspicious answers, and the ziplock baggies and (5) the canine alert, when combined with the above factors, gave Hromiak probable cause to justify a search of the car without a warrant.

After the district court's denial of Randall's motion to suppress, he pleaded guilty to one count of possession of cocaine base with the intent to distribute. The conditional plea agreement specifically retained Randall's right to appeal the denial of his motion to suppress. Randall now appeals the denial of that motion to this Court.

## STANDARD OF REVIEW

We review determinations of reasonable suspicion and probable cause *de novo*, while findings of fact are reviewed for clear error. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). "When reviewing the denial of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government." *United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998).

## ANALYSIS

When analyzing whether a traffic stop violates the Fourth Amendment, a reviewing court must undertake " 'an objective assessment of an officer's actions in light of the facts and circumstances then known to him.' " *United States v. Ferguson,* 8 F.3d 385, 388 (6th Cir.1993) (quoting *Scott v. United States,* 436 U.S. 128, 137, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)).

A police officer may stop a vehicle if the officer has a reasonable suspicion that a crime is or has been committed. *United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The Supreme Court has described reasonable suspicion as "a particularized and objective basis" for suspecting that a person is involved in criminal activity. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

An officer may also stop a vehicle if the officer has probable cause to believe that a traffic offense has occurred, even if the offense is minor and the stop is merely a pretext to investigate other crimes. *See Whren v. United States,* 517 U.S. 806, 810, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Ferguson,* 8 F.3d at 391. Probable cause exists where the facts and circumstances

---

[1]. Section 4511.33 of the Ohio Revised Code provides, in pertinent part: "Whenever any roadway has been divided into two or more clearly marked lanes for traffic, ... [a] vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic...." Ohio Rev. Code Ann. § 4511.33.

within an officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a reasonable person's belief that an offense has been or is being committed. *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

Both probable cause and reasonable suspicion are not "finely-tuned standards" and are "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Rather, these "fluid concepts ... take their substantive content from the particular contexts in which [they] are being assessed." *Ornelas,* 517 U.S. at 696.

I. *Did the Officer's Stop of Randall's Vehicle Comply with the Fourth Amendment?*

■ Randall first asserts that the stop of his vehicle violated the Fourth Amendment's proscription against unreasonable seizures because Hromiak was not justified in stopping Randall for a lane violation. Our analysis on this point is informed by *United States v. Freeman,* 209 F.3d 464 (6th Cir.2000), in which we determined that "one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time [does not] constitute[ ] a failure to keep the vehicle within a single lane 'as nearly as practicable.'" *Id.* at 466 (quoting Tenn. Code Ann. § 55–8–123). Judge Clay, writing in concurrence, elaborated on the circumstances surrounding the stop, noting that conditions were windy on the day in question and that the motor home, a top-heavy vehicle, was rounding a curve when the alleged lane violation occurred. *Id.* at 467–68 (Clay, J., concurring). These factors precluded a finding that a traffic violation had occurred under the Tennessee statute, which, like the statute here, re-

quired a vehicle to be driven as nearly as practicable within a single lane of traffic. *See id.* at 466; *id.* at 467–68 (Clay, J., concurring).

The circumstances here are distinguishable from those in *Freeman.* Here the vehicle in question, unlike that in *Freeman,* violated the integrity of the lane at least three times within a span of approximately two miles. Further, the record here, again unlike that in *Freeman,* does not reveal any circumstances that would have made it not "practicable" for Randall to drive the vehicle within a single lane. Other courts have similarly distinguished *Freeman. See United States v. Meyer,* No. 01–3022, 2001 WL 1219394, at **4 & n. 3 (10th Cir. Oct. 10, 2001) (finding *Freeman* factually distinguishable where weather was optimal and vehicle drifted across lane twice); *United States v. Page,* 154 F.Supp.2d 1320 (M.D.Tenn.2001) (distinguishing *Freeman* where vehicle partially left lane several times in brief span of time, including crossing the center line into traffic); *cf. United States v. Gregory,* 79 F.3d 973, 978 (10th Cir.1996) (finding, under similarly phrased statute, that under mountainous and windy conditions a single instance of leaving a lane did not justify stop). Finally, unlike in *United States v. Gregory,* 79 F.3d at 978, a case relied upon in *Freeman,* the state statute here has been viewed, in dicta, as possibly providing probable cause upon "even a momentary 'bobble.'" *State v. Woodrum,* No.00CA50, 2001 WL 1709970, at *6 (Ohio Ct.App. Nov. 20, 2001).

Given that Randall violated the integrity of the lane three times in the span of two miles without any circumstances that would have made it impracticable to drive his vehicle within a single lane, we conclude that Hromiak had probable cause to believe that Ohio Revised Code § 4511.33 had been violated. His stop of Randall's

vehicle was, therefore, reasonable. *See Whren,* 517 U.S. at 810, 813.

## II. *Did the Officer's Detention of Randall for Questioning Comply with the Fourth Amendment?*

■ Randall also argues that, even if the initial stop was justified, his continued detainment for questioning after he gave Hromiak his license and the rental car agreement violated the Fourth Amendment.

Randall was stopped for a traffic violation. In such cases, we have concluded that an officer may ask questions related to a driver's purpose for traveling, *United States v. Hill,* 195 F.3d 258, 268 (6th Cir. 1999), as well as questions about the driver's identity, *United States v. Potts,* No. 97–6000, 1999 WL 96756, at *3 (6th Cir. 1999). Further, this Court has also ruled that an officer can lawfully detain the driver of a vehicle in the back of his police cruiser until after the officer has finished verifying the driver's license, checking other records, and issuing a citation, as these acts are within the purposes of the initial stop. *United States v. Wellman,* 185 F.3d 651, 656 (6th Cir.1999)(involving the issuance of a courtesy citation); *United States v. Bradshaw,* 102 F.3d 204, 212 & n. 19 (6th Cir.1996) (involving the issuance of a regular citation). During this time, the officer may discover evidence of another crime, which is not illegally obtained as long as the purposes of the initial stop have not yet been accomplished. *Wellman,* 185 F.3d at 656–57; *Bradshaw,* 102 F.3d at 212.

Here, Hromiak asked Randall to have a seat in his vehicle while Hromiak examined the car rental agreement and verified Randall's license. Further, Hromiak testified that, for his own safety, he prefers to place people in the back of his patrol car, a decision that this Court has refused to second guess, *Bradshaw,* 102 F.3d at 212 n. 19. Upon entering the cruiser, Hromiak began a records verification over his computer, which was not completed by the time the canine unit arrived, approximately seven minutes after Randall was pulled over. Thus, Randall's questioning and detention was lawful, at least until the canine unit arrived, as the period of detention did not exceed the time necessary to effect the purposes of the initial stop.

While it may not be entirely clear that Hromiak had finished his record check before the canine inspection was complete (*see* J.A. at 59, 72, 73), this does not render illegal the completion of the canine walk. Facts ascertained during an initial stop may provide reasonable suspicion for further detention. *See Hill,* 195 F.3d at 270–72; *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir.1995). By the time the canine unit had arrived, Hromiak knew of the suspicious nature of Randall's rental arrangement. He also had observed Randall's nervous demeanor and heard his inconsistent and unusual answers to routine questions. In addition, Hromiak had discovered the ziplock baggies, which he knew were commonly associated with drug trafficking. These facts and observations created a reasonable suspicion of possible narcotic trafficking that justified Randall's brief detention while the canine unit inspected his vehicle. Indeed, similar facts have been held to create reasonable suspicion sufficient to justify a person's detention. *See, e.g., Hill,* 195 F.3d. at 271–72 (finding reasonable suspicion based upon suspects' demeanor, inconsistent and unusual explanations, cash rental for a vehicle, and an inordinate number of used Kleenex on the floor board of the vehicle); *United States v. Palomino,* 100 F.3d 446, 450 (6th Cir.1996) (concluding that a reasonable suspicion of criminal activity arose from the suspect's inconsistent stories

about ownership of the car and the purpose of his trip, his nervousness, his past involvement in criminal activities, and an odor associated with cocaine that the officer noticed).

In summary, Randall's detention was first justified for the period necessary to effect the purposes of the initial stop. Assuming *arguendo* that the purposes of the initial stop were achieved prior to the completion of the canine inspection, evidence acquired during the initial stop gave rise to a reasonable suspicion of criminal activity that justified Randall's further detention. Thus, the entire period of Randall's detention, from the time of the initial stop to the completion of the canine inspection, was justified either by probable cause or reasonable suspicion and was, therefore, reasonable. Finally, after the dog alerted on the vehicle, Hromiak had further reason to detain Randall, as, at that point, he had probable cause to search the vehicle. *See Hill*, 195 F.3d at 273.

III. *Was Randall's Consent to the "Put-down" and Subsequent Searches Freely and Voluntarily Given?*

■ Randall also maintains that his consents to the frisk and the subsequent searches were not freely and voluntarily given.[2] Randall correctly asserts that, where the justification for a search is based upon the suspect's consent, the government bears the burden of demonstrating that the consent was freely and voluntarily given. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In this circuit, "[c]onsent must be proved by clear and positive testimony and must be unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *United States v.*

*Williams*, 754 F.2d 672, 674–75 (6th Cir. 1985). In determining whether Randall's consent was freely and voluntarily given, this Court must examine all the circumstances surrounding his consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 233–34, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The district court's determination of voluntariness is a question of fact, *United States v. Rose*, 889 F.2d 1490, 1494 (6th Cir.1989), which we review for clear error. *Ornelas*, 517 U.S. at 699.

In arguing that his consent was not freely and voluntarily given, Randall heavily relies upon *United States v. Butler*, 223 F.3d 368 (6th Cir.2000). In *Butler*, we concluded that both the defendant's consent to be placed in the back of a police cruiser and her subsequent consent to be questioned at the police station were not freely and voluntarily given. *Id.* at 375. The decision was based upon the fact that the defendant witnessed her fellow suspect, Ezekwemba, being physically forced into the police car by three officers. Id. at 372, 375. This confrontation was so violent that Ezekwemba sustained injuries to his lip or forehead. *Id.* at 372. We noted the coercive effect of this display of violence, stating "it is hard to imagine that Defendant would not have felt coerced to remain in [the] patrol car and comply with the officer's further requests." *Id.* at 375.

In contrast to the circumstances detailed in *Butler*, Hromiak's testimony does not, nor does any other evidence in the record, reveal any violence surrounding Randall's consent to the frisk and subsequent searches. Hromiak testified that he asked and was given consent to frisk Randall. He further testified that upon feeling the bulge, he asked Randall "if he wouldn't

---

**2.** Randall also asserts that his consent to wait in the cruiser was not voluntarily given. The district court, however, never relied upon

Randall's consent to wait in the cruiser. (Hearing Tr., Court's Ruling, J.A. at 171–173.)

mind taking it out for me,"[3] and that Randall did take the bag out of his pocket. Hromiak also testified that he opened the closed brown bag with Randall's consent. As the district court noted, there was no evidence to contradict the consensual nature of the frisk, the search of Randall's pocket, or the search of the bag. Given that the record does not reveal any evidence of coercion or violence, we cannot say that the district court's finding was erroneous, much less clearly erroneous.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Randall's motion to suppress.

**3.** We have previously concluded that a request for consent that is not phrased in a neutral manner is sufficient to obtain consent. *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir.1998) (en banc) ("Well, then, you don't

mind if I look around in the car then, do you, would you?")

