*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CENTER FOR BIO-ETHICAL REFORM, INC., et al.,
        *Plaintiffs-Appellants,*

    *v.*

No. 06-3284

CITY OF SPRINGBORO, A Municipal Entity; JEFFREY
KRUITHOFF; TIM PARKER; CLEARCREEK TOWNSHIP,
A Municipal Entity; PETER HERDT; JEFF PIPER;
BRIAN HUBBARD; ERIC KUHLMAN; NICK CLARK;
RANDY PEAGLER; LISA WALSH; STEVEN MORRIS;
MICHAEL BURKE; TIM SHAW,
        *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 03-00057—Thomas M. Rose, District Judge.

Argued: December 5, 2006

Decided and Filed: February 20, 2007

Before: MOORE and CLAY, Circuit Judges; BELL, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robert Joseph Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for
Appellants. Mark D. Landes, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, Boyd W.
Gentry, SURDYK, DOWD & TURNER CO., Dayton, Ohio, Benjamin C. Glassman, UNITED
STATES ATTORNEY, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Robert Joseph Muise,
THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellants. Mark D. Landes, J. Eric
Holloway, ISAAC, BRANT, LEDMAN & TEETOR, Columbus, Ohio, Boyd W. Gentry, Jeffrey C.
Turner, SURDYK, DOWD & TURNER CO., Dayton, Ohio, Benjamin C. Glassman, UNITED
STATES ATTORNEY, Cincinnati, Ohio, for Appellees.

_____

[*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan,
sitting by designation.

---

**OPINION**

---

CLAY, Circuit Judge.  Plaintiffs, Center for Bio-Ethical Reform, Inc., Mark Harrington, Quentin Patch, and Dale Henkel, appeal from the district court's grant of summary judgment to Defendants on their claims under 42 U.S.C. § 1983 that Defendants[1] violated their constitutional rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, and conspired to violate those rights.  For the reasons that follow, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.

**BACKGROUND**

Plaintiff Center for Bio-Ethical Reform, Inc. ("CBR") is a pro-life public policy and advocacy group incorporated as a non-profit § 501(c)(3) organization in California.  Among other things, CBR engages in self-described educational programs to promote their cause.  Through one of these educational programs – the "Reproductive Choice Campaign" – CBR, its employees, and volunteers drive box trucks on "the streets and highways of major cities and towns throughout the United States," and these trucks display "large, colorful pictures depicting graphic images of first-term aborted fetuses." (J.A. at 75-76)  These pictures often included the caption "Choice," as well as CBR's contact information.  Plaintiffs Mark Harrington ("Harrington"), Quentin Patch ("Patch"), and Dale Henkel ("Henkel") were all employees and volunteers who participated in the Campaign, either by driving the box trucks themselves or by driving an escort vehicle along with the trucks.

On June 10, 2002, Plaintiffs were driving these box trucks on the streets and highways of the greater Dayton, Ohio area.  That day, Harrington and Patch each drove one of the box trucks, while Henkel followed in the escort vehicle.[2]  Harrington and Patch each wore protective body armor.  In addition to the body armor, the drivers sometimes wore helmets and, on that day, Patch wore such a helmet.  The escort vehicle was a black Crown Victoria equipped with a video camera mounted on the dashboard and a cage behind the driver's seat.  The vehicle had a shotgun rack, radio communication equipment, amber lights in the back, and antennae on the roof and trunk.  All three vehicles contained mace, which Plaintiffs stored in a plastic bin and kept on hand to be used defensively "in case someone approaches the truck and threatens" them. (J.A. at 285)  The vehicles were further equipped with a radio system so the drivers could communicate with one another.

That day, Plaintiffs began driving the trucks across several counties near Dayton, Ohio before 10:00 a.m.  Around 4:00 p.m., they decided to park the vehicles for the night.[3]  On the day

---

[1]Plaintiff named as Defendants the following individuals and entities:  the City of Springboro and Clearcreek Township, as municipal entities; Springboro Police Chief Jeffrey Kruithoff; Clearcreek Township Police Chief Peter Herdt; FBI Supervisory Special Agent Steven Morris; FBI Special Agents Michael Burke and Tim Shaw, in their official capacities; and Kruithoff, Herdt, Morris, Burke, Shaw, Clearcreek Township Officers Jeff Piper and Brian Hubbard, and Springboro Officers Tim Parker, Lisa Walsh, Randy Peagler, Nick Clark, and Eric Kuhlman, in their individual capacities.

[2]A fourth volunteer drove an additional escort vehicle that morning, but departed early in the afternoon to return home.  At the time of the stop in question, only one escort vehicle accompanied the two box trucks.

[3]Typically, CBR would secure offers from supporters to lodge its volunteer drivers and to provide a parking space for the trucks.  At the end of the day, the CBR volunteers generally would park the trucks at the appointed location, remove the pictures on the side of the trucks or cover them with tarps, and then proceed to the "host home" for that evening. (J.A. at 285-86)

in question, CBR had permission to park the trucks at the Hinkle farm on Pennyroyal Road. Ron Bowling ("Bowling"), a CBR supporter, met Plaintiffs at the Hinkle farm to identify the location for them. When Plaintiffs arrived at the farm, they encountered a long driveway on the crest of a hill which Harrington described as going "up and down into kind of a gully," and grew concerned about navigating the trucks down the driveway. (J.A. at 286) Harrington and Patch pulled the box trucks to the side of the road, remaining stopped there for two to three minutes, while Henkel drove the escort car down the driveway to evaluate the situation. After Henkel had assessed the situation, Harrington drove down the driveway and Patch began to follow him in the second truck. Midway down the driveway, Harrington realized that the truck would not clear the tree branches and stopped. At that point, Patch radioed Harrington to inform him that a police officer had stopped him for questioning.

Officer Nick Clark ("Clark") reported turning down Pennyroyal Road that day and observing a six- to ten-vehicle backup near the intersection at Deer Trail Road. He watched as Henkel maneuvered the escort vehicle around the trucks to pull into the Hinkle driveway, crossing a double yellow line at the top of a hill to do so. Subsequently, Clark reported that several vehicles in the line behind the trucks began to drive around them atop the hill as well. After observing these events, Clark pulled behind the truck driven by Patch and put his lights on, thereby blocking Patch into the driveway. As Clark approached the driver's side of the truck, he saw Patch wearing a helmet and body armor, and radioing that the police had stopped him.

Clark asked Patch if the trucks were lost or needed assistance, and several times asked whether he was carrying cargo in the truck. Patch responded in the negative to both questions, describing the trucks as "billboard trucks." (J.A. at 260) Patch testified that he told Clark "We're campaigning against abortion. The signs are about anti-abortion information." (J.A. at 421) Clark acknowledged realizing at some point that the pictures were expressing a message about abortion. Clark also indicated he did not ask Patch whether he had weapons, nor did he ascertain Patch's purpose for being at that particular location. On the basis of this brief encounter, Clark described Patch's behavior as "extremely nervous," explaining:

> He was looking around a lot. He was on the radio stating he was being approached by a police officer. He watched me the entire time in his side view mirror that I approached the truck. . . . That's not every day that I stop someone and they get on the radio and say they're being approached by the police, no. That's not typical behavior of a normal traffic stop.

(J.A. at 261) Ultimately, Clark did not inquire into the purpose of Patch's protective gear at the time of this initial encounter but, concerned about his own safety and perceiving Patch to be better protected, retreated to his vehicle and pulled away.

Clark then contacted Lieutenant Barton to determine whether Plaintiffs were participating in some sort of government exercise. Barton responded in the negative. At Barton's direction, Clark next contacted Detective Tim Parker ("Parker"), speaking briefly to the department dispatcher before reaching Parker. Clark described the encounter to Parker, telling him that he witnessed the escort vehicle – which he described as resembling an "unmarked police car or a law enforcement vehicle" – pass the truck crossing the double yellow lines, and that the truck's driver wore body armor and a helmet. (J.A. at 263) Clark also told Parker about the pictures on the sides of the trucks. Within five to ten minutes, Parker met Clark at the location of his police cruiser, on Deer Trail Road. Another officer, Lisa Walsh ("Walsh"), arrived on the scene shortly before Parker, having responded to a broadcast of the Springboro Police dispatcher. The dispatcher apparently misunderstood Clark's initial call and had erroneously announced that Plaintiffs had assault *weapons*, not merely that they

wore assault *gear*. Upon learning of the mix up, Clark radioed dispatch and told them he had not observed assault weapons.

Next, Detective Parker contacted Steven Morris ("Morris"), Supervisory Special Agent of the Federal Bureau of Investigation ("FBI") Dayton Office. Parker described Clark's encounter with Plaintiffs and mentioned the pictures on the trucks. Purportedly concerned about domestic terrorism targeting abortion doctors and clinics, Morris told Parker he would "grab a couple of guys and . . . come by and . . . find out who these people were or what they were doing." (J.A. at 356) Morris apparently called the Dayton office and, in response to his request, Agents Robert Buzzard, James Howley, Tim Shaw, and Tymothy Burkey proceeded to the scene.[4] According to Parker's account, the FBI requested that Parker prevent Plaintiffs from leaving.[5]

As the foregoing events unfolded, several other law enforcement officers arrived on the scene, including Detective Eric Kuhlman ("Kuhlman"), Sergeant Jeff Piper ("Piper"), and Officer Brian Hubbard ("Hubbard"). Parker testified that these officers responded to a dispatch made at his prompting to other local jurisdictions that described a stop of someone in SWAT gear, eliciting information about possible SWAT training exercises. Parker further deduced that the officers proceeded to the scene without specific direction.

In the meantime, Plaintiffs had identified a secondary location to park the trucks for the night (a local church's parking lot) and had completed covering the pictures on the sides of the trucks with tarps. More skilled at handling the trucks, Harrington backed the first truck out for Patch, they switched drivers, and Patch began heading toward the church. Two police cars followed Patch. Harrington then returned to the second truck, backed it out of the drive, and drove in the same direction as Patch. Henkel subsequently returned to the escort car and, just before he turned out of the driveway, five police cars surrounded him, thereby blocking the car in the driveway. Henkel exited the car and stood nearby as Bowling approached the officers and began to talk with them. This occurred around 5:00 p.m.

About twenty minutes after the police blocked him in, Henkel approached the vehicle to retrieve some of his belongings and was ordered to stay away from it. From that point on, the officers directed one of their number to "watch over" Henkel for the duration of the encounter. (J.A. at 319) During that time, Henkel had no idea what was going on. At approximately 7:00 p.m., the officers asked Henkel for permission to search the escort car. The first time, Henkel responded it was not his car and thus he could not give permission to search it. They asked a second time with greater force, and Henkel again responded he could not grant permission, directing them to Plaintiff Harrington. A third time the officers asked even "more forcefully" to search, and Henkel said something to the effect of "I have nothing to hide. The bag is the only thing in there that's mine. Do what you want." (J.A. at 320)

The officers proceeded to search the escort vehicle. Therein, they found a Kevlar helmet and vests, Henkel's bag, and, in the trunk, various "maintenance stuff" described by Henkel to include tarps, a plastic gas container, Windex, paper towels, and battery cables. (J.A. at 321) Sometime around 7:45 or 8:00 p.m., a man identifying himself as an FBI agent approached Henkel and asked for his name, address, telephone number, and driver's license, and informed him that they were "going to kick [him] loose in about twenty minutes." (J.A. at 319) An estimated ten to fifteen

---

[4]The record in no place refers to Michael Burke, who Plaintiffs named as a Defendant in this suit.

[5]At his deposition, Morris could not "remember directing anybody with the other departments to . . . do one thing or the other," and acknowledged it was not "the FBI's show." (J.A. at 357)

minutes later, the officers began to leave Hinkle's driveway and Henkel departed the scene to find Harrington and Patch. At no time did the officers tell Henkel why he was not free to leave.

Down the road from the Hinkle farm, other officers followed Harrington and Patch who, upon seeing the officers' lights, pulled off Pennyroyal Road into the subdivision on Queensgate Road. Approximately six or seven law enforcement vehicles were present at that point, surrounding the trucks so they essentially could not move. Officer Randy Peagler ("Peagler") approached the first truck (driven by Patch), unsnapping his holster as he neared the passenger side of the vehicle. Looking first into the passenger side window to check for weapons, Peagler then walked around to the driver's side. Patch reports that, in fact, Officer Walsh approached the driver's side window of the truck and asked him to step out. When Patch had exited the truck, Walsh "started questioning about what was on board and what [they] were doing and straight forward things, could she look at [Patch's] driver's license, who are [they], what are [they] doing . . . ." (J.A. at 424) This initial interview lasted ten minutes. Patch indicated that later, one FBI agent also questioned him and inspected his driver's license.

While the other officers approached Patch in the first truck, Clark approached the second truck (driven by Harrington). Harrington reported observing a male police officer walking on the curb opposite the parked vehicle with his hand over his holster. This officer eventually walked up to the driver's side door and asked Harrington to exit the truck, which he did. The officer then asked Harrington for his driver's license and, taking it with him, walked away from Harrington.

Harrington reported waiting for three hours. During this time, he repeatedly asked Walsh why they could not leave, and Walsh responded that she was "checking on it" and "need[ed] to hear from a supervisor." (J.A. at 290) Later, Walsh testified that, in her view, neither Harrington nor Patch were free to leave the scene after the first twenty-five minutes of the stop. Parker had directed Walsh via radio to hold Plaintiffs at the Queensgate location even 45 minutes after the stop, saying "they're not free to go" and "if you have to place him under arrest." (J.A. at 511) Nevertheless, the officers did not handcuff Plaintiffs Harrington and Patch, did not place them into a police vehicle, and did not order them to the ground at any point.

During the stop, Harrington orally consented to a search of the trucks. By Harrington's account, he felt compelled to do so given the "show of force."[6] (J.A. at 292) Accordingly, he "permitted them to look through the cab and wherever they wanted" because he felt they had "nothing to hide." (*Id.*) The officers further requested to search Harrington's overnight bag. Harrington asked, "Do I really need to do that?" to which the officer responded, saying something to the effect of, "Well, you gave us entrance into the truck cab. You've given us permission to search the truck cab." (J.A. at 294) Believing that consent to search the truck somehow implied permission to search the overnight bag, Harrington reluctantly consented.

Peagler recalled that the officers had completed the investigation of the two trucks at the Queensgate location within twenty-five minutes, and that they had not uncovered any criminal activity. Nevertheless, at Parker's direction about thirty minutes into the investigation, the officers had Plaintiffs raise the tarps covering the sides of the trucks and they proceeded to photograph the

---

[6]As Harrington testified,

> They asked to search the vehicle and, you know, when you have 12 police cars and a guy that's had his hand like this [near his holster] and we're being detained unlawfully, I think you don't say no. You feel like you need to – you better comply, so I allowed him to search the cab.

(J.A. at 293)

pictures. Still later, the officers had the Plaintiffs roll up the tarps a second time to examine the pictures and take additional photographs. The officers completed the search before the FBI agents arrived on the scene.

After approximately two hours, the FBI arrived at the scene and FBI agent Tim Shaw ("Shaw") approached Harrington, asking him for his driver's license. Harrington asked Shaw why they were being held and alleges that Shaw responded, "Don't talk to me unless I speak to you." (J.A. at 290-91, 484) Harrington asked again, and Shaw apparently replied, "We believe you're involved in some criminal activity." (J.A. at 291) Harrington reached for his cell phone to call his attorney and, upon seeing this, the agent "ushered [him] to the back side of the truck away from all the people." (*Id.*) As the agent did this, Harrington handed Patch a camera because he felt threatened. Observing this, one of the FBI agents purportedly grabbed the camera from Patch.

After Harrington finished calling his attorney, the FBI agent held him at the back of the truck for a period of five to ten minutes. During this time, one of the plain-clothed officers had a conversation with Harrington "about the[] pictures and how [CBR] should do this a different way, how [CBR] should get [its] message out a different way." (J.A. at 294) Harrington characterized it as "almost a debate on abortion with the guy" and recalls the agent said, "You need to find a different method. . . . Children see those, what about children seeing those, don't you think children shouldn't see those . . . ." (*Id.*) One of the agents further questioned Harrington about CBR, the purpose of the trucks, and whether they had firearms in the trucks.

Agent Shaw, on the other hand, reports that after Harrington spoke to his attorney, Harrington "provided documentation as to ownership of the vehicles, showed [him] the Kevlar helmets and vests, allowed [him] to make sure there were no weapons in the truck." (J.A. at 484) Additionally, Agent Shaw described the FBI's concerns and its motivation in establishing a presence on the scene:

> The fact that people are driving around in panel trucks similar to the size that was used in the Oklahoma City bombing, this occurred shortly after 9/11. We have a number of domestic terrorist individuals and groups in the area. So the concern is, is why do you have helmets and Kevlar vest, why do you have a police vehicle or police-looking vehicle, what is the purpose of this that was what our concern is. . . . [I]t was a public safety concern. . . . [W]hen you have a police vehicle, basically a vehicle that . . . was drop dead for what a cop car would be, you have panel trucks driving around with individuals inside with vests and helmets, that is a concern.

(J.A. at 490) Agent Shaw further indicated that once Harrington "settled down" and conveyed the group's purpose in a calm and "cordial" fashion, "any concern [he] had was dispelled" and Plaintiffs "were let go." (J.A. at 491)

At the very earliest, Harrington and Patch were not free to leave the scene until 7:30 p.m., but by Harrington's estimation the stop lasted three hours. When they finally could leave, the law enforcement officers escorted them to the church parking lot. Plaintiffs aver that, as a result of this incident, they will no longer conduct their Campaign in or around Springsboro or Clearcreek Township.

Subsequent to the June 10, 2002 incident, Chief Peter Herdt ("Herdt") of the Clearcreek Township police directed Piper to draft a "simple memo," and not to open a case file, describing the incident without referencing the names of officers present. (J.A. at 333) Herdt reportedly did so because he perceived the stop as an FBI investigation. However, Herdt also admits to anticipating a lawsuit and credits the "simple memo" for enabling him to "truthfully respond[] to [Harrington that

the station] had no case file on him or his group or there was no names and no investigation." (J.A. at 339)

Plaintiffs filed this civil rights action against Defendants in February 2003, alleging violations of their First, Fourth and Fourteenth Amendment rights, as well as conspiracy to violate civil rights. Plaintiffs sought injunctive and declaratory relief, nominal, compensatory, and punitive damages, and attorneys' fees. The parties on both sides separately filed motions for summary judgment following discovery. On January 3, 2006, the district court entered an order granting summary judgment to Defendants on all counts. That same day, the district court entered final judgment in favor of Defendants, disposing of all the parties' claims and terminating the case. Plaintiffs timely appealed to this Court.

## DISCUSSION

## I.      MUNICIPAL LIABILITY AND OFFICIAL IMMUNITY

### A.      Municipalities (Defendants City of Springboro and Clearcreek Township)

At the outset, we affirm the district court's grant of summary judgment to Defendants City of Springboro and Clearcreek Township in its entirety. Applying *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), the district court found the municipalities immune to punitive damages claims and properly granted summary judgment on Plaintiffs' claims for punitive damages against Defendants Springboro and Clearcreek on that basis. Additionally, the district court found the municipalities immune from suit.

The Supreme Court has long held that municipal governments may only be sued under § 1983 for unconstitutional or illegal municipal policies, and not for unconstitutional conduct of their employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997) (collecting cases). Additionally, where the established policies of the municipality do not violate the constitution directly, municipalities may incur § 1983 liability where they fail to adequately train their personnel such that a constitutional policy is applied in an unconstitutional manner. *City of Canton*, 489 U.S. at 387. There, however, the plaintiff must show "the failure to train amounts to deliberate indifference to [the] rights of persons with whom the police come into contact." *Id*. at 388. In essence, the municipality must have exhibited deliberate indifference to "known or obvious consequences," and mere "simple or even heightened negligence will not suffice" to render it liable. *Brown*, 520 U.S. at 407; *see also Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006).

Here, the only policy Plaintiffs identify is "an 'unwritten rule' [of the Springboro Police] that if the FBI is called, the officer relinquish the scene over to them." (Pl.'s Br. at 48) Plaintiff has not shown that the City of Springboro actually knew this unwritten rule would lead to unconstitutionally long detentions. Moreover, in the case at bar, the time frame grew longer because the FBI agents were traveling to the scene at rush hour, making the consequences less than obvious to the municipality which purportedly established the rule. At most, the municipality negligently adopted a policy that posed a risk to the Fourth Amendment rights of its citizens in certain circumstances. It cannot be said that Springboro acted with "deliberate indifference" to the constitutional rights of its citizens in adopting the rule. Further, Plaintiffs do not allege that any policy or custom of the Clearcreek Township police was unconstitutionally applied. Such generalized assertions amount to nothing more than an attempt to hold the municipality liable under *respondeat superior*, a move unsupported by clearly established precedent of the Supreme Court. Accordingly, we uphold the

district court's grant of summary judgment to Defendants Clearcreek Township and City of Springboro in its entirety.[7]

### B. Federal Officers (Defendants Morris, Burke, and Shaw) – Official Capacity Claims

Neither will we disturb the district court's summary judgment grant to the federal officers on the official capacity suit. As sovereign, the United States is immune from suit, unless it waives this immunity and consents to suit. *United States v. Dalm*, 494 U.S. 596, 608 (1990); *see also Butz v. Economou*, 438 U.S. 478, 504 (1978) ("The barrier of sovereign immunity is frequently impenetrable."); *Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 115 (6th Cir. 1988). Congress must expressly waive the Nation's sovereign immunity, or federal courts cannot exercise jurisdiction over claims brought against the United States. *Reed v. Reno*, 146 F.3d 392, 398 (6th Cir. 1998). By extension, sovereign immunity also protects the officers and agents of the United States from suit in their official capacities. *Chasin*, 845 F.2d at 115-16 ("[T]he bar of sovereign immunity cannot be avoided simply by naming officers and employees of the United States as defendants."). Accordingly, the district court correctly granted summary judgment to Defendants Morris, Burke, and Shaw on the official capacity claims against them.

## II. QUALIFIED IMMUNITY & FIRST AMENDMENT RETALIATION

### A. Standard of Review

This Court reviews a district court's grant of summary judgment *de novo. Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 597 (6th Cir. 2002). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When presented with a motion for summary judgment, the court views the evidence and draws all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In effect, "any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (internal citation omitted). The district court errs by granting summary judgment for the defendant where issues of credibility are determinative of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994).

To support a grant of summary judgment, the moving party "may . . . discharge[] [its initial burden] by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has done this, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby, Inc.*, 477 U.S. at 252. Further, we review a lower court's determination of defendants' entitlement to qualified immunity *de novo. Siggers-El v. Barlow*, 412 F.3d 693, 699 (6th Cir. 2005); *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000).

---

[7]A municipality may also incur liability for municipal policy effectively set by high-ranking individuals with final decision-making authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality opinion); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736 (1989). However, in their brief on appeal, Plaintiffs do not explicitly argue that municipal policymakers caused the lengthy detention, nor do they identify record support for such claims.

## B.    Plaintiffs' First Amendment Rights

Plaintiffs argue, in their brief on appeal, that the district court erred in granting summary judgment on their First Amendment claim because, in their view, Defendants stopped and detained them in retaliation for the message expressed on the sides of the trucks and have consequently chilled their free expression. Analyzing Plaintiffs' claim as one of retaliation for exercise of free speech rights, the district court concluded that the record did not show Plaintiffs' exercise of constitutional rights, rather than concern for public safety, motivated the stop. Specifically, the court found

> as a matter of law that, when stopped for a traffic violation, and found to be in possession of police equipment, radio equipment, body armor and kevlar helmets, a three hour detention would not chill a person of ordinary firmness from continuing in this particular activity, participation in the public debate on one of the most contentious issues in society today.

(J.A. at 190-91) The court further concluded that the officers were protected by qualified immunity since their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." (J.A. at 191)

Long-settled Supreme Court precedent acknowledges protection for "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For § 1983 suits against both state officials and federal officials, the qualified immunity analysis does not differ. *Butz v. Economou*, 438 U.S. 478, 504 (1978). We first consider whether "the facts alleged show the [defendants'] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Next, we determine whether that right was "clearly established" at the time of the alleged violation. *Id.* Applying this inquiry while viewing the facts in the light most favorable to Plaintiffs, the district court erred in granting summary judgment on this claim.

### 1.    *Plaintiffs' Right Against Retaliation*

As a threshold matter, we must determine whether, when "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. We evaluate claims that state actors retaliated against a claimant in response to his exercise of free speech under the framework generally set forth in *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Under *Mount Healthy* and its progeny, a plaintiff must show that (1) he was participating in a constitutionally protected activity; (2) defendant's action injured plaintiff in a way "likely [to] chill a person of ordinary firmness from" further participation in that activity; and (3) in part, plaintiff's constitutionally protected activity motivated defendant's adverse action. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998) (internal citations omitted); *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). Once a plaintiff raises an inference that the defendant's conduct was motivated in part by plaintiff's protected activity, the burden shifts and defendant "can demonstrate that it would have taken the same action in the absence of the protected activity." *Arnett v. Myers*, 281 F.3d 552, 560-61 (6th Cir. 2002) (citing *Thaddeus-X*, 175 F.3d at 399). The inquiry of "whether activity is 'protected' or an action is 'adverse'" is context-specific. *Thaddeus-X*, 175 F.3d at 388.

The First Amendment generally protects Plaintiffs' right to display signs communicating their views on abortion, and "[t]he fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of constitutional protection." *Hill v. Colorado*,

530 U.S. 703, 714-15 (2000); *see also Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) ("Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects . . . . That is why freedom of speech, though not absolute, . . . is nevertheless protected against censorship or punishment."). The district court correctly found that Plaintiffs had "engaged in protected activity," (J.A. at 116), and Defendants do not argue otherwise.[8]

We next consider whether the adverse action "would chill or silence a 'person of ordinary firmness' from future First Amendment activities." *Thaddeus-X*, 175 F.3d at 397 (citation omitted) (noting the "standard is amenable to all retaliation claims"). Here, Plaintiffs need not show they were actually deterred from exercising their right to free speech, but rather must show the actions were "capable of deterring a person of ordinary firmness from exercising his or her right[s]." *Id.* at 398. A chilling effect sufficient under this prong is not born of *de minimis* threats or "inconsequential actions," but neither does the requisite showing permit "solely egregious retaliatory acts . . . to proceed past summary judgment." *Id.*

Deprivation of one's liberty of movement can hardly be classed "inconsequential;" indeed, the Founders endeavored scrupulously to protect this liberty in the Constitution. *See* U.S. const. amend. IV; U.S. const. amend. XIV. A two and one-half hour detention absent probable cause, accompanied by a search of both their vehicles and personal belongings, conducted in view of an ever-growing crowd of on-lookers, would undoubtedly deter an average law-abiding citizen from similarly expressing controversial views on the streets of the greater Dayton area. *See McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001) (impliedly acknowledging an arrest without probable cause constitutes adverse action of sufficient consequence); *cf. Lucas v. Monroe County*, 203 F.3d 964, 974 (6th Cir. 2000) (loss of business after being removed from a police station's rotating call list sufficient to "deter the average wrecker service operator" from similarly criticizing defendant sheriff).

Finally, we evaluate the motivation for Defendants' actions. Plaintiffs argue that their speech motivated Defendants to stop and detain them. Specifically, Plaintiffs aver that Defendants knew their trucks were used to send an anti-abortion message prior to the challenged stop, that Defendants' post-incident reports label them as "anti-abortionists," that Agent Morris profiled them as domestic terrorists on the basis of their cause, that Defendants took photographs of the sides of Plaintiffs' trucks, and that Defendants made various comments purportedly criticizing Plaintiffs' method of expressing their message. (Pl.'s Br. at 41)

Summary judgment is not appropriate where genuine issues of material fact exist, Fed. R. Civ. P. 56, and Defendants' motivation in this case presents such a genuine issue. Viewing the facts in the light most favorable to Plaintiffs, as we must when reviewing disposition by summary judgment, we cannot definitively say that Defendants stopped and detained Plaintiffs without regard to their protected expression. As we have previously observed, "claims involving proof of a defendant's intent seldom lend themselves to summary disposition." *Bloch*, 156 F.3d at 682 (internal brackets and citations omitted); *see also Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997) (finding "inferences raised by the evidence of record . . . sufficient to create a question of fact and avoid summary judgment" where the record statements "reveal the possibility that . . . [the defendant] did have a retaliatory motive"); *McCurdy*, 240 F.3d at 520 (remanding a claim that an officer retaliated against plaintiff for his speech by executing an otherwise valid arrest for an inquiry

---

[8]Defendants City of Springboro, Kruithoff, Parker, Walsh, Peagler, Clark, and Kuhlman (hereinafter collectively "Defendants Springboro and its Officers") argued that Plaintiffs were not engaged in protected speech at the relevant time because they had covered the pictures on the sides of the truck. They further argue there is "no evidence in the record to show that the officers were aware of the prior speech at the time of the stop." (Def. Springboro's Br. at 37) This is simply not the case. (*See* J.A. at 260, 264, 356, 376, 421)

into the officer's motivations); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056-57 (6th Cir. 2001) ("[B]ecause plaintiff has established elements of her claim for First Amendment retaliation, summary judgment for defendants is proper only if the evidence is such that *every* reasonable juror would conclude that the defendants have met their burden.") (emphasis in original); *Arnett*, 281 F.3d at 561 (same).

Plaintiffs' allegations, if proven at trial, could be taken by a reasonable jury to support their claim that Defendants were motivated to detain them in part because of their constitutionally protected speech. Patch testified that, when initially approached, he informed Officer Clark that the trucks were "billboard trucks" and that Plaintiffs were "campaigning against abortion. The signs are about anti-abortion information." (J.A. at 260, 421) The record reflects that Clark told Detective Parker about the pictures on the sides of the trucks when he contacted him to describe the encounter. When Detective Parker subsequently contacted FBI Agent Morris, Parker too mentioned the pictures on the trucks. Later, after stopping Plaintiffs and searching the trucks, the officers had Plaintiffs raise the tarps covering the pictures on the trucks and took photographs on two separate occasions. Plaintiffs aver that the first time the officers took pictures at the direction of Detective Parker.

Additionally, Harrington testified that one plain-clothed officer had a discussion with him about the pictures on the sides of the trucks, stating "You need to find a different method. . . . Children see those, what about children seeing those, don't you think children shouldn't see those . . . ." (J.A. at 294) Harrington further indicated that one of the FBI agents questioned him about CBR and the purpose of the trucks. Thus, as the en banc court stated in *Thaddeus-X*, Plaintiffs here "have put forward a number of specific, nonconclusory allegations and identified affirmative evidence that could support a jury verdict at trial." *Thaddeus-X*, 175 F.3d at 399-400; *see also Arnett*, 281 F.3d at 560-61 ("Circumstantial evidence . . . may support this inference.").

Summary judgment may nevertheless be proper if "the defendant can show that he would have taken the same action in the absence of the protected activity." *Thaddeus-X*, 175 F.3d at 399. In the case at hand, Defendants bear the burden of proving that *both* the investigative stop and the rather lengthy detention would have taken place absent Plaintiffs' constitutionally protected activity. Rather than "profil[ing] [Plaintiffs] on account of their opposition to abortion," (Pl.'s Br. at 41), Defendants stopped Plaintiffs because they were dressed in body armor and Kevlar helmets, driving large box trucks in the company of what looked to be a mock law enforcement vehicle. Observing any other individuals in similar dress and vehicles, Defendants would undoubtedly have "taken the same action" to allay their concerns. Defendants' suspicions that Plaintiffs were engaged in terrorist or criminal activity motivated the stop, not Plaintiffs' pro-life viewpoint or message. The prolonged detention of Plaintiffs, however, presents quite a different question in view of the fact that the initial searches revealed nothing to justify further detention of Plaintiffs. Because genuine issues of material fact remain, we next consider whether Defendants may be held to account under § 1983.

### 2.    *Plaintiffs' Rights Were Clearly Established*

Qualified immunity does not protect those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("Given malice and the lack of probable cause, the complainant enjoyed no immunity."); *see also Butz*, 438 U.S. at 506. Accordingly, the law must "put the officer on notice" of the bounds of lawful conduct, and if it fails to do so, the court may properly grant summary judgment on qualified immunity grounds. *Saucier*, 533 U.S. at 202; *see also Harlow*, 457 U.S. at 818 ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments."). "The contours of the right" at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), and these contours must be established by "binding precedent from the Supreme Court, the Sixth Circuit, or the district court itself, or case law

from other circuits which is directly on point," *Barrett*, 130 F.3d at 264 (internal citations omitted); *cf. also Hall v. Shipley*, 932 F.2d 1147, 1152 (6th Cir. 1991). Relevant precedent need not involve the "very action in question;" rather, "in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. In reviewing the district court's grant of qualified immunity, we must determine whether a reasonable officer could have believed Plaintiffs' stop and subsequent detention to be constitutional, given the state of clearly established law and the Defendants' motivation in so detaining them.

Here, preexisting law confronts a factually similar circumstance, making clear that the *Mount Healthy* inquiry applies to police action to seize a plaintiff's person. In *Dietrich v. Burrows*, we considered whether a group of police officers were entitled to qualified immunity when they executed an arrest absent probable cause allegedly in retaliation for the plaintiffs' prior speech. *Dietrich v. Burrows*, 167 F.3d 1007, 1013 (6th Cir. 1999). There, we stated unequivocally, "Supreme Court decisions rendered long before the actions at issue in th[at] case recognize that government actions may not retaliate against an individual for the exercise of protected First Amendment freedoms." *Id*. (citing *Mount Healthy*, 429 U.S. at 283-84). The "contours of the right" to be free from retaliation were thus abundantly clear on the day Defendants stopped and detained Plaintiffs.

Moreover, a reasonable officer, when faced with the circumstances of this case, would have known that detaining Plaintiffs *because of* their speech would violate their clearly established First Amendment rights. This, of course, presents very squarely a factual question inappropriate for resolution on summary judgment – that of Defendants' motivation in detaining Plaintiffs. *See Bloch*, 156 F.3d at 682 ("[C]ourts that have considered qualified immunity in the context of a retaliation claim have focused on the retaliatory intent of the defendant."). Because retaliatory intent proves dispositive of Defendants' claim to qualified immunity, summary judgment was inappropriate.[9] *Id*. (internal brackets and citations omitted) ("[C]laims involving proof of a defendant's intent seldom lend themselves to summary disposition."); *see also Barrett*, 130 F.3d at 263; *Hall*, 932 F.2d at 1154. We hold the district court erred in finding Defendants, as sued in their individual capacity, were entitled to qualified immunity from Plaintiffs' First Amendment retaliation claim, and accordingly, we reverse on this issue and remand for further proceedings.[10]

## III.    QUALIFIED IMMUNITY & PLAINTIFFS' FOURTH AMENDMENT CLAIMS

### A.    Standard of Review

This Court reviews district court grants of summary judgment and qualified immunity *de novo*, as set forth in Section II.A., *supra*. Voluntariness of consent to search constitutes a question of fact, which this Court reviews for clear error. *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999). The district court's decision is clearly erroneous where "although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.*

---

[9]Had Defendants merely stopped Plaintiffs to dispel their suspicions, summary disposition of Plaintiffs' retaliation claim would have been appropriate since Defendants could then show they would have taken the same action in the absence of the protected activity. Because Defendants went on to detain Plaintiffs for two and one-half hours beyond the time necessary for local law enforcement to investigate and alleviate suspicions, when viewing the evidence in the light most favorable to Plaintiffs, the question becomes one for the jury.

[10]Insofar as the record shows that named Defendant Michael Burke had no role in the June 10, 2002 incident, we affirm the district court's grant of summary judgment to Defendant Burke in its entirety.

### B.        Plaintiffs' Fourth Amendment Rights

#### 1.        *Plaintiffs' Constitutional Rights Were Violated*

Again, we begin by determining whether "the facts alleged show the officer's conduct violated a constitutional right," and we view the facts in the light most favorable to Plaintiffs. *Saucier*, 533 U.S. at 201. Plaintiffs argue that the officers violated their Fourth Amendment rights both in unduly detaining them and in subjecting them to multiple searches over the course of their detention. In evaluating these claims, the district court surmised that

> [t]he investigating officers' suspicions were understandably aroused. A three-hour detention in these circumstances, circumstances that additionally include knowledge that a doctor lived in the vicinity of the traffic stop, was not excessive in light of the scope.

(J.A. at 193) Additionally, the district court concluded the officers had qualified immunity "even if the detention was excessive," relying for support on a comparison to the Supreme Court's 2005 decision in *Muehler v. Mena*, 544 U.S. 93 (2005). We disagree, and hold that Plaintiffs' Fourth Amendment rights were violated.

> The Fourth Amendment provides

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. As the Supreme Court has observed, "[t]he purpose of the Fourth Amendment is . . . to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (internal citations omitted).

#### a.        *Seizure*

We find the district court erroneously concluded the "detention was reasonable because it lasted only so long as it took the appropriate investigating agency, the F.B.I., to arrive on the scene and conduct a 20-25 minute investigation." (J.A. at 119) Viewing the evidence in the light most favorable to Plaintiffs, the otherwise unobjectionable *Terry* stop ripened into an unconstitutional seizure in light of the undue and unjustifiable length of the stop.

The Fourth Amendment unquestionably prevents unreasonable seizures of persons. Where an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see also Mendenhall*, 446 U.S. at 553; *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000). In effect,

> a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Mendenhall*, 446 U.S. at 554.  Such seizures – known as *Terry* stops – do not violate the Fourth Amendment where the officer "possesses a reasonable and articulable suspicion that a person has been involved in criminal activity" and, in such situations, the officer can briefly detain the person "to investigate the suspicious circumstances." *United States v. Heath*, 259 F.3d 522, 528 (6th Cir. 2001) (citing *United States v. Hurst*, 228 F.3d 751, 756-57 (6th Cir. 2000)); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972).  A showing insufficient to constitute probable cause can nevertheless justify a *Terry* stop "*[b]ecause of* the limited nature of the intrusion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975) (emphasis added).

Under *Terry*, courts examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *see also United States v. Hardnett*, 804 F.2d 353, 356-57 (6th Cir. 1986); *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990); *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993).  Courts evaluate the reasonableness of such seizures in light of the "balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brignoni-Ponce*, 422 U.S. at 878; *see also United States v. Place*, 462 U.S. 696, 703 (1983).

Defendants "seized" Plaintiffs within the meaning of the Fourth Amendment when they pulled Plaintiffs over to investigate the situation.[11]  No "reasonable person" in Plaintiffs' position would have felt "free to leave" given the "show of official authority" at both the Pennyroyal and Queensgate locations.  *See Mendenhall*, 446 U.S. at 554; *see also Butler*, 223 F.3d at 374.  Both stops involved a significant number of law enforcement personnel – officers from two local police stations and, later, the FBI.  Further, Plaintiffs were not, in fact, free to leave, as Walsh had been directed to keep them at the scene.

This initial seizure was proper in light of the Defendants' reasonable and articulable suspicion that criminal activity was afoot.  Such a seizure is permissible where officers assess all the objective facts and circumstances, and that assessment "raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418 (1981).  Here, Defendant Clark observed Plaintiffs driving box-style trucks while dressed in body armor and Kevlar helmets, accompanied by a vehicle modeled to look like a law enforcement car.  This occurred in a post-9/11 and post-Oklahoma City bombing context, at a time when law enforcement officers were in a heightened state of alert to fight would-be terrorists.  When Clark initially made contact with Patch, he overheard Patch on the two-way radio telling Harrington the police were approaching him and observed him behaving in an "extremely nervous" manner.  (J.A. at 421)  Thus, specific and articulable facts gave rise to reasonable suspicion to stop Plaintiffs.

While reasonable suspicion justifies the initial stop in this case, this detention ultimately ripened into an "arrest" absent probable cause.  An otherwise permissible investigative detention that "last[s] . . . longer than is necessary to effectuate the purpose of the stop" can constitute an unreasonable seizure.  *See Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also Heath*, 259 F.3d at 529-30 (citing *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997)) (noting an "officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances").  In some cases, "[t]he length of the detention . . . alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." *Place*, 462 U.S. at 709.  In evaluating an investigative detention, courts consider not only the length of the stop, but also "whether the police diligently pursue their investigation," whether they "could

---

[11] We refer here to the stop effectuated after Defendant Clark's initial contact with Plaintiffs, which occurred as Plaintiffs left the Hinkle farm.

have minimized the intrusion on respondent's Fourth Amendment interests," *Place*, 462 U.S. at 709, and whether delay can be properly attributable to the suspect's evasive actions. *United States v. Sharpe*, 470 U.S. 675, 687 (1985).

We evaluate the reasonableness of the length of Plaintiffs' detention in view of the totality of the circumstances. *Mendenhall*, 446 U.S. at 554; *Heath*, 259 F.3d at 529. Under the totality of the circumstances, it appears that the detention here did not "reasonably relate[] in scope to the circumstances which justified the interference in the first place." *See Terry*, 392 U.S. at 20. At the outset, the officers acted to investigate suspicions born of men driving box trucks, wearing SWAT gear, and accompanied by a car built to look like a law enforcement vehicle. In a post-9/11 world, these elements understandably combined to raise the suspicion that Plaintiffs were engaged in terrorist activity. Thus, at the outset, the officers were justified in stopping Plaintiffs.

However, the lengthy detention of Plaintiffs far exceeded the limited purpose of the stop.[12] Defendants Springboro and its Officers concede that it took fifteen to twenty minutes to search the escort vehicle and check Henkel's identification and registration at the Pennyroyal location. They further concede that it took approximately twenty minutes at the Queensgate location to question Plaintiffs Harrington and Patch, to search the trucks, and to determine "no warrants were out on the[] men." (Def. Springboro's Br. at 23) Viewing the evidence in the light most favorable to Plaintiffs, the detention lasted two and one-half hours after the local officers completed their investigation.

Defendants present at both the Pennyroyal and Queensgate locations held Plaintiffs substantially longer than necessary to "dispel their suspicions" that Plaintiffs were engaged in terrorist activity or plotting. *See Royer*, 460 U.S. at 502. Defendants Springboro and its Officers attribute much of the delay to waiting for the FBI to arrive at the scene so it could investigate as well, since "the F.B.I. 'has the bigger picture.'" (Def. Springboro's Br. at 24) However, Defendants' "continued detention" of Plaintiffs over a period of three hours – two and one-half of which were beyond the time necessary for local law enforcement to investigate and alleviate suspicions, when viewing the evidence in the light most favorable to Plaintiffs – operated to "ripen[] the investigatory stop into an arrest." *See Butler*, 223 F.3d at 375.

Further, we consider the governmental interest advanced by the stop against "the nature and extent of the intrusion upon the individual's Fourth Amendment rights." *See Place*, 462 U.S. at 705. The public undoubtedly has a compelling interest in detecting would-be terrorists. *See Terry*, 392 U.S. at 22 (government interests in "effective crime prevention and detection" sufficient); *Mendenhall*, 446 U.S. at 561 (detection of those trafficking "deadly drugs" a compelling interest). However, this interest was served when local law enforcement determined Plaintiffs did not pose a threat. The extent of the intrusion on Plaintiffs rights here was great. Plaintiffs were "subjected . . . to the public indignity of being personally detained," *see Place*, 462 U.S. at 709, inasmuch as Defendants pulled them over in a residential subdivision and on the side of an apparently busy street, effectively held them for three hours, and did so in front of neighbors and onlookers who had stopped to assess the situation.[13] Plaintiffs were decidedly not free to leave during that three hour

_____

[12]Defendants Clearcreek Township, Herdt, Piper, and Hubbard (hereinafter "Defendants Clearcreek and its Officers") cite *United States v. Montoya de Hernandez*, 473 U.S. 531, 542-544 (1985), observing that the Supreme Court found a 16-hour detention reasonable there. This case is inapposite since it involved suspicion that the defendant was smuggling drugs in her alimentary canal and, despite the diligence of the officers to allay their concerns, the purpose of the stop required a lengthy detention.

[13]Defendants Clearcreek and its Officers duplicitously seek to attribute partial blame for the delay on Plaintiff Harrington for "calling his attorney from the scene when he was being questioned by the FBI." (Def. Clearcreek's Br. at 27) We find it inappropriate to attribute blame to Plaintiff Harrington for seeking advice of counsel, especially in light

period.  Moreover, while Plaintiffs admit that Defendants did not handcuff them or use physical force to restrain them, Defendants effectively restrained Plaintiffs since Defendants' vehicles had surrounded Plaintiffs' trucks and escort car.

In *United States v. Davis*, a decision closely on point, we admonished that absent probable cause, officers may not detain citizens once their suspicions, however reasonable initially, have been dispelled in order to conduct a second search of the same nature.  430 F.3d 345, 356 (6th Cir. 2005).[14]   There, officers stopped the defendant for speeding, but on the belief that he was transporting illegal drugs, detained the defendant until other officers arrived at the scene with a drug-sniffing dog.  *Id*. at 349-50.  Approximately thirty minutes later, the drug-sniffing dog arrived and it failed to alert.  *Id.* at 350.  Meanwhile, an agent of the federal Drug Enforcement Administration ("DEA") had arrived on the scene.  *Id*.  That agent then contacted a neighboring locality to request a drug-sniffing dog, although "it is unclear whether [the agent] was aware of the fact that a drug-sniffing dog had already been used to search [the] vehicle." *Id*.  The second dog arrived on the scene approximately one and one-half hours into the stop and positively alerted.  *Id.*

In *Davis*, this Court found that the officers lawfully stopped the defendant initially, but that once the first drug-dog failed to alert, "the officers' suspicions . . . were dispelled." *Id*. at 356.  At that point, "[t]he use of the second dog and the continued detention of [the defendant's] vehicle served no investigatory purpose," and violated the Fourth Amendment.  *Id*.  Pertinently, the *Davis* court stated

> To allow police to delay further a suspect for the purpose of obtaining another drug-sniffing dog, whether intentionally *or as the result of miscommunication*, where the first dog failed to alert positively gives law enforcement power that only comes with probable cause.  The Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions.

*Id*. at 357 (emphasis added).

Like the first and second drug-sniffing dogs in *Davis*, local law enforcement and the FBI conducted the same investigation and search of Plaintiffs.  Although the record does not clearly indicate whether the detention occurred at the direction of the FBI or of local law enforcement, or merely arose from confusion and miscommunication, it makes little difference.  To delay Plaintiffs for the purpose of enabling the FBI to arrive at the scene to conduct effectively the same investigation when the initial investigation conducted by local law enforcement had dispelled their suspicions similarly "served no investigatory purpose." *See Davis*, 430 F.3d at 356.  The investigation conducted by local law enforcement allowed "the police to test the validity of their suspicions," and in the end, did not reveal a basis for probable cause. *See id.* at 357.  Thus, we find that Defendants violated Plaintiffs' Fourth Amendment rights by subjecting them to an unreasonable seizure of their persons.

---

of the fact that Defendants had already questioned Plaintiff and completed at the least an initial search of both trucks and Plaintiffs' overnight bags.

[14]Our reliance on *Davis* to determine whether Defendants violated Plaintiffs' rights is not misplaced.  We note, however, that *Davis* does not inform our conclusion in Section III.B.2, *infra*, that this right was clearly established as *Davis* followed the challenged incident by several years.

### b.          *Search*

Plaintiffs further argue that Defendants violated their Fourth Amendment rights in searching the trucks, escort vehicle, and their personal belongings, and that "any consent to search was made invalid by the actions of the police." (Pl.'s Br. at 39) The district court, however, found Plaintiffs had validly given consent. We agree that Plaintiffs validly consented to the search of the trucks, the escort vehicle, and their personal belongings.

We evaluate the validity of consent under the totality of the circumstances. *Butler*, 223 F.3d at 375; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "Consent must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." *Butler*, 223 F.3d at 375 (citing *United States v. Williams*, 754 F.2d 672, 674-75 (6th Cir. 1985)). Relevant factors in this analysis include the suspect's "youth, lack of education or low intelligence, the lack of any warnings regarding the accused's constitutional rights, as well as evidence of duress or coercion, such as, deprivation of food or sleep and prolonged detention or questioning." *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988) (internal quotations and citations omitted). Voluntariness of consent to search constitutes a question of fact, *Schneckloth*, 412 U.S. at 227, and this Court reviews the district court's factual findings for clear error. *Worley*, 193 F.3d at 384. The district court's determination is clearly erroneous where "although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.*

In this case, the evidence on the record does not support a "definite and firm conviction" that the district court clearly erred. Plaintiffs' detention lasted approximately three hours – a circumstance likely to coerce them into consenting. However, the initial consent to search occurred within the first twenty-five minutes of the stop, before the detention reached coercive lengths. Plaintiffs were not interrogated during the stop; they were merely questioned and asked to produce identification. At no point were they placed under physical arrest, handcuffed, or commanded to lay on the ground. Additionally, Plaintiffs were well-educated, mature individuals. Thus, under the totality of the circumstances, we cannot say the district court clearly erred in finding valid consent to search.

### 2.          *Plaintiffs' Rights Were Clearly Established*

We hold that the district court erred in finding the federal and state officers, sued in their individual capacity, were protected by qualified immunity. To decide whether qualified immunity is proper, we again consider whether Defendants violated a "clearly established" constitutional right. *Saucier*, 533 U.S. at 207. In so doing, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. The contours of the right must be sufficiently clear. *Id.*; *Procunier v. Navarette*, 434 U.S. 555, 564 (1978). Yet, sufficient clarity does not require previous adjudication of the very question at hand, as "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Rather, "in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.

Here, the "contours" of Plaintiffs' Fourth Amendment rights were "sufficiently clear that a reasonable official would understand" that detaining Plaintiffs over two hours after they dispelled any reasonable suspicions ripened the investigatory stop into an arrest absent probable cause. *See Saucier*, 533 U.S. at 202. Although Defendants confronted novel factual circumstances, the unlawfulness of their conduct should have been apparent in light of well-settled precedent of the Supreme Court and of this Circuit. In *Place*, the Supreme Court found that a ninety minute seizure of an airline passenger's luggage for purposes of exposure to a narcotics detection dog exceeded the scope of a permissible investigatory detention absent probable cause. *Place*, 462 U.S. at 710. *Butler* similarly found that officers executed an impermissibly long investigative detention. There, officers held the defendant for one and one-half hours after failing to find "anything out of the ordinary" during the initial stop and, subsequently, conducted a second and more comprehensive search. *Butler*, 223 F.3d at 372-73. We reaffirmed in *Butler*, as we do today, that "when police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause." *Id.* at 374 (citing *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994)); *see also Heath*, 259 F.3d at 529-31. These cases had long put reasonable officers on notice of the permissible bounds of conduct in executing *Terry*-type stops; the law was clearly established.[15] Defendants cannot now secure the shelter of qualified immunity.[16]

## IV.     PLAINTIFFS' CLAIM OF CONSPIRACY TO VIOLATE CIVIL RIGHTS

This Court reviews district court grants of summary judgment *de novo*, as set forth in Section II.A., *supra*.

Plaintiffs claim that "Defendants jointly agreed and acted in concert with one another to exercise their authority to deprive Plaintiffs of their constitutional rights." (Pl.'s Br. at 45) The district court concluded there was no evidence that Defendants had somehow entered into an agreement to deprive Plaintiffs of their rights. We hold that the district court properly disposed of Plaintiffs' claims of conspiracy to violate their First, Fourth, and Fourteenth Amendment rights.

---

[15] Although the "reasonable official" standard is an objective one, it bears noting that several of the officers involved apparently understood that the stop ripened into a constitutionally suspect detention. For example, the record, viewed in the light most favorable to Plaintiffs, indicates that Defendant Herdt directed Defendant Piper to draft a "simple memo," and not to open a case file, describing the incident without referencing the names of officers present at the June 10th detention. (J.A. at 333) Defendant Herdt admits to anticipating a lawsuit and credits the "simple memo" for enabling him to "truthfully respond[] to [Harrington that the station] had no case file on him or his group or there was no names and no investigation." (J.A. at 339)

[16] As a general rule, a claimant cannot defeat qualified immunity merely by leveling "bare allegations of malice" against government officials. *Harlow*, 457 U.S. at 817-18. However, "an essential element of some constitutional claims is a charge that the defendant's conduct was improperly motivated." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998). Where improper motivation constitutes an element of the claim – as in the case of Plaintiffs' First Amendment retaliation claims – and the claimant has shown all other elements, a question of fact remains as to the official's intent, thereby precluding summary judgment on the basis of qualified immunity. Post *Crawford-El*, it remains an open question whether inquiry into motive "unrelated to the knowledge of the law" in the Fourth Amendment context can similarly be taken to preclude summary judgment. Because we need not explore Defendants' motivations in detaining Plaintiffs to find that Defendants do not merit the protection of qualified immunity, we leave that question for another day.

Section 1985(3) creates a cause of action for conspiracy to violate civil rights.[17] To succeed in establishing a § 1985(3) claim, the plaintiff must demonstrate "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003) (citing *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)). A § 1985(3) complaint must "allege both a conspiracy and some class-based discriminatory animus behind the conspirators' action." *Newell v. Brown*, 981 F.2d 880, 886 (6th Cir. 1992). Further, "conspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987).

Plaintiffs here do not allege that Defendants acted with discriminatory animus based on a constitutionally protected *classification*. *See Dunn v. Tennessee*, 697 F.2d 121, 124 (6th Cir. 1982). Additionally, Plaintiffs' complaint does not set forth specific allegations supporting their conspiracy claim, but rather vaguely asserts that Defendants "conspired." (J.A. at 87-89) Consequently, we affirm the district court's grant of summary judgment on Plaintiffs' § 1985(3) conspiracy claim.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the summary judgment grants to Defendant City of Springboro and Defendant Clearcreek Township, to Defendant Burke, as sued in both an official and individual capacity, and to Defendants Morris and Shaw, as sued in their official capacities; we **AFFIRM** the district court's grant of summary judgment on Plaintiffs' § 1985 conspiracy claim; we **REVERSE** the district court's grant of summary judgment on Plaintiffs' First Amendment retaliation claim against Defendants Kruithoff, Herdt, Morris, Shaw, Piper, Hubbard, Parker, Walsh, Peagler, Clark, and Kuhlman, in their individual capacities; we **REVERSE** the summary judgment grant on Plaintiffs' Fourth Amendment claim against Defendants Kruithoff, Herdt, Morris, Shaw, Piper, Hubbard, Parker, Walsh, Peagler, Clark, and Kuhlman, in their individual capacities; and we **REMAND** for further proceedings consistent with this opinion.

---

[17]Section 1985(3) provides that:

> [i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (2000).